Argued 8 January; decided 25 March; decided on first rehearing 24 June; second rehearing denied 7 October, 1901.

### OREGON & CAL. R. R. CO. v. JACKSON COUNTY.

[64 Pac. 307; 65 Pac. 369.]

CONSTRUCTION OF PLEADINGS.

1. After an answer has been filed all intendments are in favor of the sufficiency of the complaint, though a more stringent construction will be adopted when the objections are presented by a demurrer: *Olds* v. *Cary,* 13 Or. 362, cited.

EQUITY JURISDICTION IN CASES PURELY OF FRAUD.

2. Equity has jurisdiction to cancel or modify a fraudulent tax assessment or other document or order whereby the complainant is injured, though the fraud is not an incident of any other ground of equity jurisdiction; in short, fraud is an independent substantive ground of equitable jurisdiction.

ENJOINING COLLECTION OF FRAUDULENT TAX.

3. Where public officers have capriciously or fraudulently assessed or equalized property for taxation so as to cast the public burdens disproportionately on certain classes of property or owners, or on particular property or persons, contrary to the spirit and purpose of the law, equity will interpose to protect the injured party and enjoin the collection of more than a just proportion of the taxes from the complainants: *West Portland Park* v. *Kelly,* 29 Or. 412, cited.

Nature of the Acts of Assessing and Equalizing.

4. Assessors and boards of equalization act in a judicial capacity in performing their respective duties, and when the roll is finally finished and equalized it stands as a judgment: *Steel* v. *Fell*, 29 Or. at p. 276, and *Kirkwood* v. *Washington County*, 32 Or. at p. 573, approved.

Injunction Against Fraudulent Taxation — Complaint.

5. A bill for an injunction restraining a county and its officers from collecting certain taxes assessed against plaintiff, is sufficient, where it alleges that the assessor, intending to defraud and discriminate against plaintiff, had assessed its property at an unequal and disproportionate rate as compared with other property in the county, the particulars of which are stated, and that a majority of the members of the county board of equalization had conspired to perpetuate and enforce the fraudulent assessment, and to that end had refused to equalize the same.

Idem.

6. A complaint asking an injunction against the collection of certain taxes, claimed to have been fraudulently assessed, and which the board of equalization had arbitrarily refused to equalize, is sufficient as to the action of the board, when it states that two members thereof conspired to and actually did act fraudulently and arbitrarily concerning the said assessment, without any allegation as to the third member, since the complaint showed that a majority of the board were acting fraudulently, and the act of the majority is the act of the board.

Method of Fixing Value of Railroad for Taxation.

7. Under Hill's Ann. Laws, § 2752, as amended by Laws 1893, p. 6, § 1, providing that real property, for the purpose of assessment, shall include all fixtures of every kind thereon, and that the same shall be assessed at its "true cash value," which is declared to be the amount for which such property would sell at a "voluntary sale made in the usual course of business," an assessor, in determining the "true cash value" of a railroad for the purpose of taxation, should take into consideration the cost of construction, the cost of replacement, its connections with other roads, its advantages for commanding the carrying trade, its rental value, its net earnings, and the market value of its stocks and bonds.

Sufficiency of Evidence of Fraudulent Assessment.

8. From a review of the testimony the court concludes that the assessor who was elected in Jackson County in June, 1894, intended to and did arbitrarily assess the property of complainant at a predetermined value and without reference to the rate at which other property was assessed, and such assessment is, of course, illegal.

Fraudulent Assessment — Action of Board of Equalization.

9. A fraudulent and illegal assessment is not validated by the ap-

proval of the board of equalization, especially where the board intentionally adhered to the excessive valuation with full knowledge of its character.

INJUNCTION — ILLEGAL TAX — EXCESSIVE VALUATION.

10.   Courts of equity will not interfere to enjoin the collection of a tax merely because the property appears to be excessively valued; but when the valuation is shown to be so grossly excessive that the assessor must have known it was not just, the courts will interpose to prevent the consummation of what would be a fraud on the taxpayer.

RAILROADS — COST NOT ALWAYS THE TRUE CASH VALUE.

11.   Under a statute requiring property to be assessed at its true cash value, which is defined to be the amount for which the property will sell at a voluntary sale in the usual course of business, the cost of building a railroad is not its assessable value where it is unsalable at even approximately that sum.

RAILROADS — RENTAL VALUE AS ASSESSABLE VALUE.

12.   Under a statute like section 2752 of Hill's Ann. Laws, as amended by Laws 1893, p. 6, § 1, requiring property to be assessed at the amount it would bring at a voluntary sale in the usual course of business, the rental value of a railroad under a lease providing for a nominal rent, and that the lessee will pay all the expenses, taxes, insurance and interest on the bonded indebtedness and stock, provided the income be sufficient for that purpose, otherwise the lessee to have the option of advancing the necessary funds or cancelling the lease, does not afford any reliable indication of the assessable value of the road, for such rental is manifestly not the value of the use of such property.

RAILROADS — DEDUCTING TAXES TO FIX NET EARNINGS.

13.   In computing the net earnings of a railroad for a given year as a basis for ascertaining its assessable value, the taxes for that year should be deducted as part of the expenses.

RAILROADS — PERIOD TO BE CONSIDERED IN FIXING NET EARNINGS.

14.   In ascertaining the net earnings of a railroad as a standard of its value, the average for a series of years should be considered.

RAILROADS — RULE FOR ASCERTAINING VALUE.

15.   The value of a railroad may be fairly determined by computing the average net earnings per mile of the road for a series of years, and capitalizing it from those earnings at the rate of interest paid on its bonded indebtedness.

RAILROADS — RULE FOR DETERMINING VALUE OF ROADBED.

16.   To determine the value of the roadbed of a railroad the value per mile of the rolling stock, depots, and grounds, which are separately as-

sessed in Oregon, should be deducted from the value per mile of the road as a whole.

### Evidence of Capricious Assessment.

17. The testimony satisfies the court that the assessment of the congressional and indemnity lands of the plaintiffs in Jackson County for the year 1896 was capriciously and arbitrarily made with intent to cause the plaintiffs to pay more than their proportionate share of the public taxes, and should have been corrected by the county board of equalization.

### Power of Supreme Court to Assess for Taxation.

18. Where an assessment and equalization of taxes was shown to have been arbitrarily and capriciously made on certain property, the supreme court will ascertain, as nearly as practicable, the appropriate value at which such property should be assessed, that justice may be done the parties, though the province of the court is not to make assessments, or revise those made and equalized by the proper authorities.

From Jackson: Hiero K. Hanna, Judge.

This is a suit by the Oregon & California Railroad Company and another against Jackson County, Oregon, and another to enjoin the collection of certain taxes attempted to be levied upon the roadbed and certain lands described in the land grant of the Oregon & California Railroad Company. The complaint, omitting some allegations of a formal nature, states, in substance, that at the general election of 1894, G. A. Jackson was elected assessor of Jackson County, and at the following general election was elected clerk thereof; that he continued in the discharge of his duties as assessor until the first Monday in July, when he resigned to enter upon his duties as clerk, and upon his qualification became a member of the board of equalization for said county; that Henry Klippel was appointed assessor in his stead, and W. S. Crowell, having been elected county judge in June, 1896, also became members of the said board of equalization; "that the said G. A. Jackson, claiming to act as assessor of said county, and intending to wrong, defraud, and oppress the plaintiffs, and intending to discriminate against the plaintiffs in the assessment of their said property, and disregarding the

laws of the state in that behalf, undertook to assess the property of plaintiff the Oregon & California Railroad Company for said year 1896, and did, under his hand, and after he was elected as county clerk aforesaid, and in anticipation of his proposed resignation as county assessor, and on the twenty-seventh day of June, 1896, make a certificate and pretended assessment of all the property owned by the Oregon & California Railroad Company in said Jackson County, Oregon, for the year 1896, and then and thereby pretended to complete the assessment of the said company, and extend the same on the assessment roll of said county," a copy of which is set out, by which it appears that the said company was assessed upon 371,044.12 acres of congressional lands, valued at $348,661, 97,794.56 acres of indemnity lands, valued at $172,248, 12,504.05 acres of contract lands, at $39,019, and 65.28 miles of "roadbed and franchise," at $10,000 per mile,—aggregating $652,800; that, pursuant to notice, the board of equalization convened at the court house at Jacksonville, in said county, October 5, and continued in session to and inclusive of October 10, 1896; that, deeming the valuation of said property excessive, unjust, unusual, and illegal, the said Oregon & California Railroad Company filed a verified petition with the said board, requesting a reduction of the assessment of its roadbed to $3,500 per mile, and of its congressional and indemnity lands to 35 cents per acre, which was denied.

After some allegations touching the equalization and the levy of taxes by the county court, the complaint further states that a warrant was duly issued and delivered to the sheriff, together with a transcript of the assessment roll, commanding him to collect the taxes charged thereon; that on March 30, 1897, and before the taxes claimed became delinquent, the company paid the sheriff all the state, county, school, and municipal taxes levied upon the assessed valua-

38 Or.—38.

tion of its rolling stock, depots, depot grounds, improvements, and contract lands, and at the same time tendered to the sheriff, thereby intending to pay upon a fair valuation of its roadbed, congressional and indemnity lands within said county, the sum of $9,036.13, which he accepted; that said sum paid the taxes upon the company's roadbed within Jackson County at the rate of $3,500 per mile, and upon 371,044 acres of congressional and 97,794 acres of indemnity lands at the average rate of 35 cents per acre; that on or about the —— day of April, 1897, the sheriff made his return of the said warrant, and pretended to return as delinquent all the property of the Oregon & California Railroad Company assessed to it for the year 1896; that thereafter the County Clerk of Jackson County, pretending to be acting under the authority of the county court, issued and delivered to the sheriff a warrant commanding him to levy upon the goods and chattels of the plaintiff the Oregon & California Railroad Company, or if none be found, then upon the real property of said company, or so much thereof as shall satisfy the taxes so charged, which warrant is regular in form, and appears to be valid upon its face, and commands the sheriff to make out of the property of the plaintiffs the sum of $18,151.58, being the balance of the said pretended taxes against the railroad company after deducting the amount paid as previously alleged, and the said sheriff threatens to, and will, unless restrained, levy upon and seize the rolling stock and railroad track, as well as the lands assessed to said company; that the said County of Jackson claims a lien upon every parcel of real property so assessed for the whole of said $18,151.58, and the right to enforce and collect the same by a sale of any and all of said rolling stock and lands; that said pretended claim and the sale of real property so threatened, if consummated, will cause and create a cloud upon the same and upon the title thereof; that the said rolling stock is in active use by plaintiff the Southern

Pacific Company in the operation of said railroad, and that the levy thereon, or any part thereof, by the sheriff, will cause the plaintiffs irreparable damage and injury, and will interfere with the said company as a common carrier of in-. terstate commerce and the United States mails, and in otherwise discharging its public duties.

It is then alleged that the said assessment of congressional and indemnity lands and the so-called 65.28 miles of roadbed and franchise at the respective amounts named was and is void, illegal, excessive, and fraudulent, and was so made by the county assessor, and so approved by said board of equalization, in disregard of the rights of the plaintiffs, and the valuations fixed thereon were so placed arbitrarily and in disregard of the laws of the state; that they were and are excessive, and were so made purposely, through prejudice against these plaintiffs as railroad companies, and for the purpose of fulfilling and carrying out certain pledges which the said assessor made to certain persons and parties in the County of Jackson, to whom he pretended to be and was indebted for his election as assessor and clerk; that said assessor adopted a uniform and arbitrary rule, whereby he undertook to assess all real property other than that of the plaintiffs in said county at one-third of its actual cash value, but undertook to assess the real estate and property of the plaintiffs at an arbitrary and excessive value; that in estimating said value he classified the said property as railroad property, and valued the same with reference to its uses and ownership, and fixed such valuation according to a pretended assessment of the roadbed of the Oregon & California Railroad Company in the State of California, disregarding the valuation placed upon railroad property of the kind in other counties in the State of Oregon; and that, in pursuance of his purpose, he arbitrarily classified said property and attempted to assess the same more than 100 per cent. higher than any other roadbed of any railroad in any

other county in the State of Oregon; that in attempting to assess the lands of the plaintiff the Oregon & California Railroad Company he denominated them congressional and indemnity lands, and valued the same according to such classification, without regard to the real value of each tract or parcel thereof; that the said assessor did not exercise any judgment or discretion in attempting to fix the valuation upon such lands, or any part thereof, or view, or cause the same to be viewed, so as to enable him to exercise his judgment in respect thereof; but that, intending to wrong and oppress the plaintiffs, and to carry out certain pledges and promises he had made to certain citizens and voters of said Jackson County to procure his election to the office of county clerk, he arbitrarily and in reckless disregard of his duty as assessor placed valuations upon so-called congressional and indemnity lands as the same now appears upon said roll, which said valuations are excessive and disproportionate to those placed upon property other than plaintiffs', and that 3ξ cents per acre is the fair and full value thereof.

It is then stated that at the time and place when and where said county board of equalization for Jackson County convened and was in session the said W. S. Crowell, acting as county judge, had full notice and knowledge of the said manner in which the assessor attempted and pretended to assess the property of the plaintiffs, and well knew that the said assessment so attempted to be made was fraudulent, excessive, arbitrary, and illegal, and was so made because of the prejudice of the assessor, and in order to carry out his aforesaid pledges; that, well knowing the same, he conspired and confederated with the assessor to perpetuate the same, and arbitrarily refused to award or render the plaintiffs any relief at the meeting of said board of equalization, or to reduce said excessive valuations; and he and said assessor conspired and confederated together, intending to wrong and defraud the plaintiffs, and, to carry out the so-called pledges

made by said assessor as aforesaid, arbitrarily permitted said illegal and excessive assessment to stand; and that plaintiffs have no plain, adequate, or complete remedy at law. A demurrer was interposed to this complaint, and, after due consideration, overruled. An answer was thereupon filed, and a trial had, resulting in a decree that the roadbed be assessed at the rate of $4,500 per mile, and the congressional and indemnity lands at an average of 50 cents per acre, from which the defendants appeal. Modified.

For appellants there was a brief over the names of *Watson & Beekman, C. B. Watson*, District Attorney, and *P. P. Prim & Son*, with an oral argument by *Messrs. Edward B. Watson* and *Benjamin B. Beekman*.

For respondents there was a brief over the names of *Fenton, Bronaugh & Muir, Hammond & Vawter* and *Colvig & Reams*, with an oral argument by *Mr. William D. Fenton*.

Mr. Justice Wolverton, after stating the facts in the foregoing language, delivered the opinion of the court.

1. The question of primary importance relates to the jurisdiction of a court of equity to entertain the suit, and in this connection it is insisted that, if such jurisdiction be held to exist, the complaint does not state facts sufficient to constitute a cause of suit. The defendants having answered over, all intendments must be indulged in favor of the sufficiency of the complaint, and the question now is, will it support a decree? When tested by demurrer, the rule is, as counsel suggest, that the allegations are to be construed most strongly against the pleader; but this condition is waived by pleading over, and the question becomes one against all reasonable intendments: *Olds* v. *Cary*, 13 Or. 362 (10 Pac. 786).

2. It is urged that fraud is not in itself a ground for

equitable jurisdiction, and that such jurisdiction will not be entertained except when founded upon one or more of three substantive causes, namely, multiplicity of suits, cloud upon title to real property, or irreparable injury. Originally, the jurisdiction of courts of equity extended to all matters of fraud, while courts of law possessed but little, if any; and the present jurisdiction of the latter courts is the result of a gradual extension of their powers. The English doctrine seems to be that equitable jurisdiction still exists in every case of fraud, and the only pertinent question arising in any given case is whether it should be exercised: 2 Pomeroy, Eq. Jur. (2 ed.), § 912; *Slim* v. *Croucher,* 1 De Gex, F. & J. 518. By reason of statutory provisions limiting the jurisdiction, the constitutional guaranties of trial by jury, and the interpretation of the courts, the doctrine has been very materially encroached upon and modified in this country, and it has become settled that the exclusive jurisdiction to grant purely equitable remedies in matters of fraud will not be exercised, and the concurrent jurisdiction to grant pecuniary recoveries does not exist, in any case where the legal remedy is adequate, certain, and complete: 2 Pomeroy, Eq. Jur. (2 ed.), § 914. Fraud, with us, however, as in England, is still a substantive ground of equitable jurisdiction, but the extent to which the jurisdiction exists or will be exercised has been much limited and circumscribed. "Courts of equity," says Christian, J., in *Wampler* v. *Wampler,* 30 Grat. 454, 459, "have an original, independent, and inherent jurisdiction to relieve against every species of fraud. Every transfer or conveyance of property, by what means soever it be done, is in equity vitiated by fraud. Deeds, obligations, contracts, awards, judgments, or decrees may be instruments to which parties may resort to cover fraud, and through which they may obtain the most unrighteous advantages, but none of such devices or instruments will be permitted by a court of equity to obstruct the requisition of

justice. If a case of fraud be established, a court of equity will set aside all transactions founded upon it, by whatever machinery they may have been effected, and notwithstanding any contrivance by which it may have been attempted to protect them. These principles have now become axioms of equity jurisprudence." To the same purpose is *Dederer* v. *Voorhies,* 81 N. Y. 153, a suit to vacate a fraudulent assessment upon lands of the plaintiff for the construction of a road, wherein it was said: "Fraud vitiates all contracts and fraudulent proceedings; and equity, as a general rule, will relieve against all deeds, writings, and assurances; also against judgments and decrees which have been obtained by fraud and imposition." The allegations of the complaint exhibit a case appropriate for the application of a purely equitable remedy; that is, for setting aside and annulling an order or judgment arbitrarily and fraudulently entered as it respects the plaintiffs. Hence the case is within the exclusive jurisdiction of a court of equity. The pertinent and important inquiry, therefore, is whether equity will entertain and apply the remedy invoked, not whether the jurisdiction exists in view of the remedies which the law affords.

3. It is a rule of equity jurisprudence that a suit will not be entertained to enjoin the collection of a tax upon the sole ground that it is excessive or illegal. So it is that courts of equity will not use the injunctive process to restrain revenue officers in the collection of taxes simply because the property of a citizen may have been irregularly or illegally assessed, unless it be to protect his rights where he is afforded no adequate remedy by due process of law: *Dows* v. *City of Chicago,* 78 U. S. (11 Wall.) 108. But there exists another rule, equally well authenticated, that, where officers with whom is lodged the duty of making and equalizing assessments act fraudulently or capriciously in the discharge of that duty, with the purpose of casting a public burden unequally upon certain property owners, or class of such own-

ers, contrary to the spirit and purpose of the law, equity will interpose to prevent the consummation of the fraud, and to that end will enjoin the collection of a tax based upon such fraudulent assessment, to the extent, at least, that it may appear unequal and unjust: *New Haven Clock Co.* v. *Kochersperger,* 175 Ill. 383 (51 N. E. 629) ; *Lefferts* v. *Board of Supervisors,* 21 Wis. *688; *Hersey* v. *Board of Supervisors,* 37 Wis. 75 ; *Brauns* v. *City of Green Bay,* 55 Wis. 113 (12 N. W. 463) ; *Merrill* v. *Humphrey,* 24 Mich. 170; *Peninsula Iron & Lumber Co.* v. *Crystal Falls Tp.,* 60 Mich. 510 (27 N. W. 666) ; *Walsh* v.*King,* 74 Mich. 350 (41 N. W. 1080) ; *Auditor General* v. *Jenkinson,* 90 Mich. 523 (51 N. W. 643) ; *Pioneer Iron Co.* v. *City of Negaunee,* 116 Mich. 430 (74 N. W. 700) ; *Dundee Invest. Co.* v. *Parrish,* 11 Sawy. 92 (24 Fed. 197) ; *Hazard* v. *O'Bannon* (C. C.), 36 Fed. 854; *Los Angeles Co.* v. *Ballerino,* 99 Cal. 593 (32 Pac. 581, 34 Pac. 329) ; *Pacific Postal Cable Co.* v. *Dalton,* 119 Cal. 604 (51 Pac. 1072) ; *Johnson* v. *Holland,* 17 Tex. Civ. App. 210 (43 S. W. 71) ; *Andrews* v. *King County,* 1 Wash. St. 46 (22 Am. St. Rep. 136, 23 Pac. 409) ; *Taylor* v. *Louisville & N. R. R. Co.,* 31 C. C. A. 537 (88 Fed. 350). In *New Haven Clock Co.* v. *Kochersperger,* 175 Ill. 383 (51 N. E. 629), it is said that : "While it is not the duty of courts, nor within the power of equity, to supervise the honest judgments of statutory officers as to valuations, equity will interfere if the valuations are fixed from improper motives and in disregard of duty." So, in *Walsh* v. *King,* 74 Mich. 350 (41 N. W. 1080) : "Fraud is ever open to remedy in a court of equity, and there can exist no good reason why relief against fraud in taxation, which in the end deprives a man of his property without due process of law, cannot be granted as well as against any other fraud." Again, Mr. Justice Cooley says, in *Merrill* v. *Humphrey,* 24 Mich. 170 : "It may be questionable, perhaps, whether these last cases (referring to cases cited) have not gone too far; but the

ruling that fraudulent taxation should be restrained wherever the case is such that the motive can be legally inquired into—as it always may be in the case of the subordinate agencies — is, in our opinion, very clearly sound and wholesome."

To the same purpose is *Brauns* v. *City of Green Bay*, 55 Wis. 113 (12 N. W. 463), wherein the court say: "It has often been held that discriminations in the valuation and assessment of property arising from mistake of fact or errors in computation or judgment on the part of assessors do not necessarily vitiate a tax, but that an intentional disregard of law in such discrimination does." And in *Andrews* v. *King County*, 1 Wash. St. 46 (22 Am. St. Rep. 136, 23 Pac. 409), the court say: "We think the uniform ruling of the higher courts has been that, while equity will not interfere to correct mere mistakes or inadvertencies, or to contravene or set aside the judgments of assessors or boards of equalization in relation to values, it will interfere when the officers fraudulently, capriciously, or tyrannically refuse to exercise their judgment by adopting a rule or system of valuation designed to operate unequally, and to violate a fundamental principle of the constitution." It is, perhaps, unnecessary to cite and quote so largely from adjudicated cases, as this court has promulgated the identical doctrine in *West Portland Park* v. *Kelly*, 29 Or. 412 (45 Pac. 901); and we should not have done so but for the contention that what was there said was unnecessary to the decision, and therefore not controlling as a precedent. In *McDonald* v. *City of Escanaba*, 62 Mich. 555 (29 N. W. 93), fraud was not an element in the controversy. True, the learned chief justice who rendered the opinion used language which would seem to indicate that there was no remedy, even in the case of fraud, except criminally or by civil process against the officers; but it must be considered in the light of the case before the court, which related to an unfair, but not fraudu-

lent, assessment.   Should it be otherwise considered, the
doctrine is in hopeless conflict with several decisions of the
same tribunal, announced some before and others subsequent
to the rendition of the decision in that case.   See Michigan
authorities above cited.

4.   It must be conceded that assessors, in fixing valua-
tions and making assessments, and boards of equalization
sitting in review of their work, act in a judicial capacity,
or in the exercise of a judicial function; and when the roll
is made up it stands in the nature of a judgment:   *Steel* v.
*Fell,* 29 Or. 272, 276 (45 Pac. 794); *Kirkwood* v. *Wash-
ington County,* 32 Or. 568, 573 (52 Pac. 568).   Hence
their findings and judgments are not subject to review or
revision except in the manner pointed out by law, nor can
they be disturbed or annulled except when they proceed ar-
bitrarily and in willful disregard of the law intended for
their guidance and control, with the evident purpose of im-
posing unequal burdens upon certain of the taxpayers.   In
the latter case, their acts being designedly oppressive and
fraudulent, equity will interpose to prevent the consumma-
tion of such purpose, as there exists no adequate, certain,
and complete remedy at law.   The writ of review provided
for by statute does not authorize inquiry into the question of
fraud, which is ordinarily one of fact; and relief by action
presupposes a submission to a fraudulent and oppressive act
by payment of a void tax before it can be invoked.   In any
event, there exists no remedy at law as practical and efficient
to the ends of justice and for the prompt administration
thereof as that which equity affords.   It not only stays the
consummation of the fraud, but by its timely interposition an
adequate adjudication of the matter in controversy is thereby
secured.

5.   Measured by this understanding of the law, the com-
plaint must be held sufficient.   It charges that the assessor,
intending to defraud, oppress, and discriminate against the

plaintiffs in the assessment of their property, and in disregard of the laws of the state in that behalf, undertook to and did actually assess the property of the plaintiffs arbitrarily, at an unequal and disproportionate rate, setting out the matter with sufficient detail and particularity to make it apparent in what particulars the fraud consists. Further, as it concerns the board of equalization, it charges that the county judge had full notice and knowledge of the manner in which the assessment was made, and, well knowing that the same was fraudulent and oppressive as to the plaintiffs, and arbitrarily and illegally made, conspired and confederated with the assessor to perpetuate such assessment, and that they together refused to award plaintiffs any relief, and, intending arbitrarily to wrong and defraud plaintiffs, permitted said illegal and fraudulent assessment to stand. So that, taken as a whole, the complaint states a good cause of suit against these officers and the county, such as entitles the plaintiffs to relief by injunction to restrain the further perpetuation of the alleged fraud.

6. Criticism is made upon the fact that it is not alleged that Klippel, the third member of the board of equalization, acted fraudulently; but this is not deemed material, as the complaint shows that a majority of the board were pursuing a fraudulent purpose, and the act of the majority is the act of the board as a body. From the view we take of the case, it is unnecessary to determine whether the complaint states a cause of suit under either of the other recognized heads of equitable jurisdiction.

7. We come now to the manner of assessing the plaintiffs' property. Except as it pertains to the assessment of the rolling stock, the property of railroads, both real and personal, is assessed in like manner as that of individuals or other corporations. The statute has provided that the terms "real property" and "land" shall, for the purpose of assessment and taxation, be held to include not only the land it-

self, whether laid out in town lots or otherwise, with all things contained therein, but also all buildings, structures, improvements, trees, and other fixtures of whatever kind thereon, and all rights and privileges belonging or in any wise appertaining thereto; and all land shall be assessed and taxed in the county in which the same shall lie: Hill's Ann. Laws, § 2752, as amended by Laws 1893, p. 6, § 1. Counsel for the respective parties differ widely as it concerns the proper method of determining the value of the real property of the plaintiffs, namely, the "roadbed," as it is termed in in the roll, the depots and buildings appertaining thereto, including the lands upon which they are situated, and the lands granted by act of congress in aid of construction. For perspicuity it may be noted in this connection that there are, since the repeal of the mortgage tax law, but two classes of real property known to the law for the purposes of taxation, viz., city, village, or town property, and all other real property, which is to be described by legal subdivisions, or in such other manner as to make the description certain: *Oregon & Cal. R. R. Co.* v. *Croisan*, 22 Or. 393, 400 (30 Pac. 219). But this classification does not inhibit the proper authorities from subdividing for the purpose of arriving at a more definite and exact valuation, providing the constitutional injunction against nonuniformity is not overreached by the system adopted: *Dayton* v. *Board of Equaliz.*, 33 Or. 131 (50 Pac. 1009). So that the assessment of the railroad property by a subdivided classification was not thereby rendered void. There is no contention that the single fact of classification has in any manner conduced to a want of uniformity in the values, and a consequent inequality of plaintiffs' railroad as compared with other real property; nor do we believe that the fact that one of these subdivided classifications is denominated "roadbed" is fatal to the assessment because it is not a sufficient description of such property as realty. The "roadbed," or railroad, has a defi-

nite location, and when reference is made to it there is no uncertainty as to what property is meant, nor can there be any doubt but that it can be found and definitely located from the description. But, should it be considered that the assessment was by an imperfect or insufficient description, the fault would constitute an irregularity only, and equity would not in this collateral way give relief upon that account alone. The "roadbed and franchise" were assessed as the property of the Oregon & California Railroad Company, but the term "franchise" was stricken out by the board of equalization. There was, however, no reduction made in the valuation on that account, so that the assessment remains at $10,000 per mile upon the "roadbed."

Real estate or "land" is required to be assessed at its "true cash value," which "shall be held and taken to mean the amount such property would sell for at a voluntary sale made in the ordinary course of business": Hill's Ann. Laws, § 2752, as amended by Laws 1893, p. 6, § 1. A railroad, considered in a commercial sense, differs widely from other property. Sales and transfers are so infrequent and unusual, except for the purposes of reorganization, that a current value cannot be said to attach to it. And it is not easy to determine what such property will sell for at a voluntary sale in the usual course of business. Ordinarily, property will sell for what it is worth for the purpose for which it is adapted, and, in the absence of a market value, its condition and uses must be considered in estimating its assessable value. In speaking of railroad property, Mr. Justice BREWER says: "When the statute provides that such property shall be assessed at its 'true cash value,' it means to require that it shall be assessed at the value it has, as used, and by reason of its use": *Pittsburg, etc., Ry. Co.* v. *Backus,* 154 U. S. 421, 430 (14 Sup. Ct. 1118). The subject has received intelligent discussion at the hands of Mr. Justice COOPER, in *Franklin County* v. *Nashville, C. & St. L. Ry.,*

12 Lea, 521, 539. He says: "The roadway itself of a railroad depends for its value upon the traffic of the company, and not merely upon the narrow strip of land appropriated for the use of the road, and the bars and cross-ties thereon. The value of the roadway at any given time is not the original cost, nor, *a fortiori,* its ultimate cost after years of expenditure in repairs and improvements. On the other hand, its value cannot be determined by ascertaining the value of the land included in the roadway assessed at the market price of adjacent lands, and adding the value of the cross-ties, rails, and spikes. The value of the land depends largely upon the use to which it can be put and the character of the improvements upon it. The assessable value for taxation of a railroad track can only be determined by looking to the elements on which the financial condition of the company depends, its traffic as evidenced by the rolling stock and gross earnings in connection with its capital stock. No local estimate of the fraction in one county of a railroad track running through several counties can be based upon sufficient data to make it at all reliable, unless, indeed, the local assessors are furnished with the means of estimating the whole road." This language has the express approval of the federal supreme court in *Columbus S. Ry. Co.* v. *Wright,* 151 U. S. 470, 479 (14 Sup. Ct. 396), and *Pittsburg, etc., Ry. Co.* v. *Backus,* 154 U. S. 421 (14 Sup. Ct. 1118). Another leading caes upon the subject is *State* v. *Illinois Cent. R. R. Co.,* 27 Ill. 64, 68 (79 Am. Dec. 396), wherein Mr. Justice Breese, speaking of the criterion by which railroad property should be appraised for purposes of taxation, says: "The inquiry should be, what is the property worth to be used for the purposes for which it is constructed? and not for any other purpose to which it might be applied or converted, or for which it might be used. In such cases, if the property is devoted to the use for which it was designed, and is in a condition to produce its maximum income, one very im-

portant element for ascertaining its present value is discovered, and that is its net profits."

To the same purpose is the following excerpt from *People* v. *Hicks,* 40 Hun, 598: "The estimate of value of any portion of the road cannot be intelligently made without some knowledge or information of it as a whole, and its business, earnings, and ordinary expenses. Railroads are constructed with a view mainly to revenue and profit upon investments, and hence the productive capacity and its earnings are matters for consideration in the estimate of their value. And the extent to which actual net earnings of a road should govern or aid such estimate is dependent upon circumstances. No arbitrary method can be prescribed of ascertaining value. In some cases the earnings of the road may be entitled to much more consideration than in others. The cost of the road is also usually to be taken into account, and the value depends upon relations present and in reasonable contemplation, because the value of property may considerably be dependent upon defined unappropriated means and facilities for increased business connections and relations, and the importance of the consequences to follow. * * * And the average net earnings of the entire line of a railroad for a number of consecutive years may properly be shown to aid the estimation of the value of the several portions of it." Again, Mr. Justice Andrews says, in *People* v. *Commissioners of Taxes, etc.,* 104 N. Y. 240, 246 (10 N. E. 440): "The rental value of real estate is frequently resorted to as a guide in fixing its aggregate value. In many cases it is a reasonable assumption that real property is worth a capital sum equal to that represented by the capitalization of its ordinary net rental. So, also, the property of a railroad corporation may be worth a sum capitalized on the basis of its average income and earning capacity. But, since the income is derived from the use of its real and personal property and also of its franchise, it is manifestly quite im-

possible to ascertain from proof of the income alone the value of either element entering into the average value of the corporate property." So it is said in *State* v. *Central Pac. R. R. Co.,* 10 Nev. 47, 74, Mr. Justice Beatty speaking for the court: "To determine the value of a railroad, then, the very first inquiry is as to its actual cost. That, *prima facie,* is its value. But if it appears that the actual cost was in excess of the necessary cost, the necessary cost is the proper standard. If it further appears that the net income of the road does not amount to current rates of interest on its necessary cost, and is not likely to do so, or if the business of the road is likely to be destroyed or impaired by competition or other cause, or, in short, if the utility of the road is not equal to its cost, then its value is less than its cost, and must be determined by reference to its utility alone." This case has been reaffirmed by the same court in *State* v. *Virginia & T. R. R. Co.,* 23 Nev. 283 (46 Pac. 723). So, too, the value of stocks and bonds may furnish an element by which to determine the worth of such property. The conditions which may unite to influence the market must be borne in mind, as they may be unnatural, and out of the usual course; but the criterion is one that may be legitimately resorted to in determining the value of the property which they represent: *State Railroad Tax Cases,* 92 U. S. 575; *Railroad & Teleph. Cos.* v. *Board of Equalizers,* 85 Fed. 302; *Cotting* v. *Kansas City Stock-Yards Co.,* 82 Fed. 850. In determining, therefore, the value of a railroad which may be said to have no current value, several elements must be taken into consideration, namely, the cost of construction, the cost of replacement, its connections with roads and advantages in a commercial way for commanding the carrying trade, its rental value, its net earnings, and the market value of its stocks and bonds. These elements are relative, and the peculiar facts of each particular case as it arises should determine which shall preponderate

in importance.   The attending circumstances and conditions usually suggest the safer guide, and by giving strict attention thereto the true cash value of the property involved may be approximately determined.   See *Louisville & N. R. R. Co.* v. *State,* 8 Heisk. 663, 796; *People* v. *Fredericks,* 48 Barb. 173; *People* v. *Pond,* 13 Abb. N. C. 1; *Trustees* v. *Guenther* (C. C.), 19 Fed. 395; *City of Dubuque* v. *Chicago, D. & M. R. R. Co.,* 47 Iowa, 196; *Louisville & N. A. R. R. Co.* v. *State,* 25 Ind. 177.

8.   Having ascertained the law governing in the premises, we now turn to a discussion of the facts as disclosed by the record.   There is such a great mass of testimony, including the exhibits, that it is utterly impossible to notice it in detail, and we cannot do more than state 'our deductions, with but brief reference to the evidence in their support. George A. Jackson was elected assessor of Jackson County in June, 1894, for a term of two years.   In 1895 he assessed the property of the Oregon & California Railroad Company as follows:   65.28 miles roadbed, at $10,000 per mile, $652,800; 65.28 miles rolling stock, at $700 per mile. $45,-696; 360,048.08 acres congressional land, $272,539.17; 80,-849.99 acres indemnity land, $139,061.53; 12,504.05 acres contract land, $40,010.20; depots, depot grounds, etc., $23,565.   This was reduced by the county and state boards of equalization as follows:   Congressional land to $258,912, indemnity land to $57,606, contract land to $38,010, depots, depot grounds, etc., to $21,293, roadbed and rolling stock to $333,267.   While engaged in the work of assessing, he had a correspondence with several of the assessors of other counties along the line of the road relative to the proper rate at which the company's roadbed and rolling stock should be assessed.   The figures thus obtained by him ranged, for assessment upon the roadbed, from $3,500 to $6,000 per mile. Assessor Burton, of Lane County, wrote to him in April as

38 Or.—39.

follows: "I wish to ascertain the assessed valuation per mile of the O. & C. R. R. roadbed in your county. I think it was $3,500 per mile in this county last year. I think that is entirely too low, and ought to be raised. In California they are assessed at $17,000 per mile. I favor $6,000 per mile, or about one-third the California assessment, for this year; but it ought to be uniform." And he replied on April 22: "Yours of the 17th inst. just at hand in regard to the assessment of the O. & C. R. R. roadbed. It was assessed last year in this county at $4,500 per mile. The roadbed has always been assessed too low throughout the state. I am in favor of putting it at $10,000 per mile, if the assessors in counties through which the road passes would stand with me for that amount. I do not think it should be put any lower than what you suggest in your letter,—$6,000 per mile. I think it is best to correspond with our brother assessors in the counties through which the road passes, and fix some uniform rate. I do not think it should be put at less than $6,000 per mile. I am willing to stand for $10,000 per mile if the rest of my brother assessors will agree to that amount." Jackson flatly told the railroad people that he intended to assess the roadbed at $10,000 per mile. He became a candidate for clerk at the next general election, and was successful. The matter of his assessment of the railroad property was much discussed during the canvass. Indeed, his position in the premises was urged by him, and by others with his explicit assent and approval, as a salient reason why he should be elected county clerk, and thereby become a member of the board of equalization, and, as such, be able to maintain the assessment as he had made it in the year previous. A newspaper published in the county, which was a warm supporter of Mr. Jackson, had this to say of his candidacy and the issue involved: "In order to meet the issue square, so as to let the railroad company carry out its programme before the people of Jackson County, the

People's Party convention preserved the issue by indorsing Mr. Jackson's assessment, and nominating him for an important place on the county board of equalization,—the position of county clerk.  The die is cast and the issue is made. Let the war begin."  In order to become qualified for entering upon the discharge of his duties as clerk, he resigned as assessor shortly before taking the oath of office.

In the meanwhile, however,—that is to say, between the time of his election and the time fixed by law for qualifying and entering upon the discharge of his duties as clerk, a period of one month,—he listed with much pains and detail all the property of the Oregon & California Railroad Company upon the assessment roll, fixed and extended the valuations, and fully completed the assessment thereof; but he neither assessed nor placed upon the roll the property of any other corporation or person.  When he had completed the assessment in the manner indicated, he attached the following certificate, omitting the venue and signature: "I, George A. Jackson, assessor of Jackson County, Oregon, do hereby certify that the foregoing is a correct assessment of all the property owned by the O. & C. R. R. Co. in Jackson County, Oregon, this 27th day of June, A. D. 1896."  The assessment roll was subsequently completed by Henry Klippel, who was appointed to succeed Jackson; but no change was made in the assessment of the railroad company's property made by Jackson, which was as follows:  65.28 miles roadbed and franchise, at $10,000 per mile, $652,800; 65.28 miles rolling stock, at $635 per mile, $41,452; depots and depot grounds, $25,770; 371,044.12 acres congressional land, $348,661; 97,794.56 acres indemnity land, $172,248; 12,504.05 acres contract land, $39,019; 800 cords of wood, $2.50 per cord, $2,000,—total valuation, $1,281,950.  It will be observed that he assessed the roadbed the same as in 1895, but the congressional and indemnity lands at a materially larger figure.  When the board of equalization met,

notice was served upon the company, citing it to appear and show cause why its assessment as returned by the assessor should not be raised. In obedience thereto the company appeared by its attorney and other authorized agents, and petitioned the board to reduce the assessment, especially that made upon its roadbed, rolling stock, and congressional and indemnity lands, for the reason that all of such property had been excessively valued and assessed. After hearing the statements and arguments of these representatives, the board took the matter under advisement, and on the tenth of October, 1896, made and entered the following order (omitting preliminary and other matters not pertinent) : "This board, having carefully examined into the matter of the assessment of all the property of said railroad company as returned by the assessor of Jackson County, finds that the average assessment for the year 1896 of all the nontillable or unimproved lands owned by said company in Jackson County is one dollar sixteen and one-half cents per acre, and the average assessment per acre of all the nontillable or unimproved lands of other taxpayers of said county for year 1896 as returned by the assessor of said county is two dollars twenty-three and one-third cents, which is one dollar six and five-sixths cents per acre higher than the same class of lands owned by said railroad company are assessed for said year; and the board, being fully advised in the premises, finds that the assessment of said railroad company's lands is neither unreasonable nor unjust. And this board, on careful examination and investigation, finds that in former years the railroad bed of said company was assessed in the State of Oregon at an average of about four thousand dollars per mile, while the extension of the same railroad line in the State of California was on the average over seventeen thousand dollars per mile. And this board, after full and careful examination and investigation, being now at this time fully advised in the premises, refuses to reduce the assessment of the railroad

bed of said company below the sum of ten thousand dollars per mile as returned by the assessor of this county for the year 1896. And this board further refuses to reduce the assessment on any of the lands of said railroad company as returned by the assessor of this county for the year 1896, * * * and this board orders that the word 'franchise,' wherever it appears in the assessment of the property of said railroad company for the year 1896, be, and the same hereby is, stricken out of said assessment."

Mr. Jackson, explaining his said assessment, says in his affidavit filed with a motion to vacate the preliminary injunction and made a part of the testimony in this case: "In making such assessment of said roadbed and placing a valuation thereon, I took into consideration the fact that said company had borrowed $30,000 per mile on all its lines of roadbed through Jackson County and State of Oregon, the cost of its right of way and clearing and grading the same, the cost of ties, rails, culverts, and bridges; and I also took into consideration that since the same was bonded or mortgaged for $30,000 per mile said company has made expensive improvements thereon in the way of new steel rails and extensive fills in the place of the old trestles on the line of its said road in Jackson County. I also took into consideration in fixing said value on said roadbed that the same line of road through Siskiyou County, California, was assessed at $17,408.00 per mile, and the tax at such valuation was being paid by the railroad company." When questioned as to whether the board took into consideration the earning power of the railroad, he replied, in effect, that the matter was talked about when the petition for reduction of the assessment was presented, but that the board did not consider it at all as an element or basis of assessment, and that they did not regard the income as a proper rule for valuation of such property. He further testified that Mr. Koehler admitted the road would cost $20,000 per mile to rebuild it, and that

he made the assessment at one-half this figure. Judge Crowell, who served on the board of equalization with Jackson, and with whom it is charged in the complaint he confederated to arbitrarily maintain the assessment as made, was elected county judge at the same time Jackson was elected clerk, though upon a different party ticket, and he must have known of the issue upon which Jackson made his canvass. His specific reasons for maintaining the assessment are also contained in an affidavit, which is made a part of his testimony, and are as follows: "I had the same general information that every intelligent and reading citizen has as to the cost of railroads in general, and, in addition thereto, the plaintiffs, by their agent and officer, Mr. Koehler, admitted to and before said board that said roadbed and line was bonded at $30,000 per mile, that it cost that sum or more per mile to build it, and that some parts of said road cost as much as $100,000 per mile to construct; that the continuation of said line of railroad south of Jackson County in the State of California was admitted by said Koehler to be assessed at about $13,000 per mile for taxation; that the said facts and admissions before said board, and with no evidence of any kind to the contrary before it, and said officers and attorney having neither produced nor offered to produce any evidence or witnesses to show that said assessment was excessive or beyond the cash value of its said property, or that it was assessed higher than other property in said county in proportion to cash value; and from the further fact that said board, from a careful and full examination made by it, at that time, of the assessment roll (believed) that the lands of said railroad company were appraised by said assessor Jackson at nearly 50 per cent. less than other nontillable or wild lands, not owned by it, were assessed,—that from all said facts, evidence, and admissions aforesaid, and not from prejudice or fraud, this affiant, as a member of said board, and said board as a unit, refused to reduce the assess-

ment of the roadbed, lands, and other property of said railroad company." Elsewhere in his testimony Judge Crowell states that the board took into consideration other elements of value beyond what is mentioned in his affidavit. He says, also, that he wrote the journal entry showing the final adjudication of the equalization of the railroad company's property.

It will be noted from this brief reference to the testimony that the central and controlling idea which prompted and finally induced these functionaries to assess the roadbed at $10,000 per mile, and maintain the same at that figure, was that the California & Oregon Railroad, which passes through Siskiyou County, California, adjoining the State of Oregon on the south, was assessed at over $17,000 per mile. To show that the basis thus assumed is an erroneous one, the law and manner of assessment in California need only be stated and defined. The law requires the franchise, railway, roadbed, rails, and rolling stock of all railroads operated in more than one county in the state to be assessed by the state board of equalization: Cal. Pol. Code, § 3665. J. S. Swan, a member of the said state board, testifies that the Oregon & California Railroad is owned by the Central Pacific and operated by the Southern Pacific Company, and, employing his language, he continues: "Each member of the state board held, and very correctly so, that, the nearer the center of population this railroad was located, the more valuable it was: as, for instance, to illustrate, say, in San Francisco, the value would be $100,000 per mile; outside of Oakland, in Alameda County, say $30,000 per mile; and so on, decreasing in value in proportion to the distance said road might be from the center of population. Then adding up the value of the road in each county would give an approximate value of the roadway, roadbed, rails, and rolling stock, being the constituents that go to make up the value of the plant. To this would be added the value of the state franchise, which is

often considered of great value, inasmuch as it is held that the said franchise gives life to the first four constituent parts before named. * * * The railroad in question, running between San Francisco and the northerly boundary of California, receives its greatest value from the portions thereof lying within the populous counties and cities of the state, such as San Francisco, Alameda, San Joaquin, and Sacramento. Under the pro rata distribution of the whole value of the five elements before named, constituting a railroad as required by the constitution and statutes of California, remote counties, such as Shasta and Siskiyou counties, receive the benefit of the greater value of the railroad in San Francisco, Alameda, San Joaquin, and Sacramento counties. * * * The average value per mile of the Central Pacific Railroad in the State of California, under the pro rata distribution of the total assessment of all railroads of that company in said state made by the state board of equalization for 1896, was the sum of $17,408.53, upon which the taxes were assessed and paid." Another standard for comparison may be mentioned, which indicates in a marked degree that there is a wide difference between the values of the two roads as shown by a table indicating the net earnings per mile of the Central Pacific, which is $3,453, as against $362 per mile of the Oregon & California, without deduction of taxes. At any rate, the standard of comparison of one road with another lying in a different state, for the ascertainment and fixing of values for assessment purposes, is unsafe and unsatisfactory.

It is in evidence, also, that the mileage rate of assessment of the roadbed of railroads within this state, in other counties, from 1891 to 1896, ranges from $2,000 on branch lines to $5,500 on main lines, and of the Oregon & California System from $2,000 to $4,500 per mile. It may be safely affirmed that real property, other than that belonging to the railroad company, was assessed in Jackson County in 1896

at about 50 per cent. of its real cash value. One of the witnesses, whose judgment may be considered good, puts the estimate as low as one-third of such value, while others put it at 60 to 66 per cent.; but a survey of the whole testimony in the case bearing upon the subject leads one to conclude that 50 per cent. is a fair estimate. Mr. Jackson, in writing to Mr. Coolidge, clerk of the state board of equalization, says of the assessment of 1895 that he listed the property at about 75 per cent., and told Mr. Howard, after his election as assessor, that he intended to assess real property at one-third of its value. From these indications the purpose of Mr. Jackson is in a manner disclosed; but it is a matter of which the court may almost take judicial cognizance that the assessing officers have been valuing real property at a very large percentage below its real cash value; and the practice in Jackson County. is by no means an exception to the prevailing rule. If all real property was assessed at the same ratio of value, there could be no inequality. It might affect the tax rate, but would still be uniform between the taxpayers. If one class of real property, however, is assessed by a percentage valuation higher than another, it needs no argument to demonstrate that it would be inimical to the constitutional requirement of uniformity. But, notwithstanding the erroneous principle upon which the county authorities proceeded in making the assessment, as shown by the record, it is strenuously urged that these functionaries honestly used and exercised their best judgment in fixing values, and hence that their action cannot be revised. As it respects Mr. Jackson, there is but little doubt that he proceeded with a purpose of setting a preconceived and arbitrary value upon the roadbed of the company, and, as we shall see later, upon its congressional and indemnity lands, without respect to their relative value as compared with other real property assessed within the county; and that the assessment was capriciously made in the first instance.

9.   Nor do we think the action of the board of equalization has cured the evil.   The valuation as made by the assessor was tenaciously adhered to upon the essential and specific idea which seems to have prompted him, and it is so largely in excess of all other assessments of like roadbeds within the state as to carry with it the presumption that the board of equalization adhered to the overestimate by design, for the purpose of discrimination, especially in view of the fact that other real property was assessed at such a low percentage of value.

10.   It was said in *City of Chicago* v. *Burtice,* 24 Ill. 489, the court speaking through Caton, C. J.: "As no mathematical rule can be applied to determine with certainty the value of real estate, and especially unimproved city property, it must be expected that the judgments of men will differ, and, if commissioners honestly estimate property too high or too low, the court will not disturb it; but when an assessment is made so wide of the true value, as established by witnesses, as to raise the presumption that it was overestimated from design, and especially when the court can see the motives prompting such design, it will not and ought not to hesitate to so find."   And again, in *Pacific Hotel Co.* v. *Lieb,* 83 Ill. 602, Mr. Justice Scholfield says: "And, since the value of property is matter of opinion, upon which different minds, with equal opportunities of knowledge, and actuated by the same honest desire to arrive at the truth, are liable to differ widely, it has been always held in this court that a court of equity will never interfere to enjoin the collection of a tax merely because the property has been assessed at a greater valuation than the court would have fixed upon it.   Where, however, the valuation is so grossly out of the way as to show that the assessor could not have been honest in his valuation,—must reasonably have known that it was excessive, —it is accepted as evidence of a fraud upon his part against the taxpayer, and the court will interpose."   In further illus-

tration of conditions under which fraud will be inferred, see *Chicago, B. & Q. R. R. Co.* v. *Cole*, 75 Ill. 591; *Dundee Invest. Co.* v. *Parrish* (C. C.), 24 Fed. 197; *Cal. & Or. Land Co.* v. *Gowen* (C. C.), 48 Fed. 771; *Taylor* v. *Louisville & N. R. R. Co.*, 31 C. C. A. 537 (88 Fed. 350); *Railroad & Teleph. Cos.* v. *Board of Equalizers*, 85 Fed. 302. We are impelled, therefore, to the conclusion, upon the whole record, that the equalization has not cured the fraudulent assessment. It goes without saying that, other real property having been assessed at 50 per cent. of its real cash value, the real estate of the railroad company should be assessed at the same percentage of value, if the injunction of uniformity is to be observed.

11. It is insisted that the court should be governed as to the value by what the railroad cost, or, if not by that standard, then by what it would cost to replace it, which, under the evidence, is about the same thing, namely, $55,000 per mile. It is at once apparent that the railroad would not sell for that sum, or anything like it, at a voluntary sale in the ordinary course of business. This being so, that standard is not to be depended upon, as it will not bring about the result which the statute contemplates.

12. The rental value is suggested, which is a substantial guide, if it can be ascertained. The Oregon & California Railroad, with its connections and branches, has been leased to the Southern Pacific Company. The lease or agreement by which we are to be governed is the one bearing date August 1, 1893, as it appears to stand in the stead of all prior leases between the parties. The effect of this agreement is that the Southern Pacific Company will operate the lines of the Oregon & California Railroad Company in Oregon; that it will pay a nominal rental of $5,000 per annum, and out of the earnings and income derived from such operation pay the incidental and operating expenses, taxes, and insurance, certain damages to persons and property, expenses of

repairing, maintaining, improving, adding to and keeping up such leased railroads, rolling stock, and equipments, the interest on bonded indebtedness then existing or such as may be subsequently created, interest at 6 per cent. on the common and 7 per cent. on the preferred stock of the corporation; and, if anything remains of the earnings and income, then that the same be retained by the Southern Pacific Company as its own; but, should the net earnings and income derived from the demised premises be insufficient in any year to pay the current interest for the year upon the bonded indebtedness, it is left optional with the Southern Pacific Company whether or not to advance or pay the amount of such deficiency; and it is provided that, in case it should pay such deficiency, it shall be entitled to be reimbursed therefor, with interest, out of any subsequent income, and shall have a lien therefor upon such demised premises and the income thereof until fully reimbursed for such advances and payments, with interest. Other like provisions are contained in the lease, by which the Southern Pacific Company may reimburse itself for advancements made for betterments and the like, and for acquiring a lien upon the property, until such advancements are repaid. From these provisions it would seem that the Southern Pacific Company is not required to pay as a rental for the premises the interest on the bonded indebtedness of the company. All the net income derived from the operation of the road goes to the payment of interest so far as it will avail for the purpose, but any surplus of interest which it has undertaken to pay over and above the net income is to be refunded to the Southern Pacific Company out of future earnings, and it is made a lien or charge upon the Oregon & California lines until paid. The profit which the Southern Pacific Company is to derive from its operation of the road depends upon the condition that the interest upon the bonded indebtedness and the expenses for betterments and improvements and the interest on the pre-

ferred and common stock of the company shall be first paid, while there is no condition by which said company obligates itself to pay all these charges; hence the leasing furnishes no evidence of rental value, and there is no other source from which the information may be obtained.

13. The plaintiffs have produced evidence showing the net earnings per mile of the Oregon & California Railroad Company's lines. Two estimates are made commencing with the year 1891, and extending to and inclusive of 1897. One includes, while the other deducts, the taxes, in arriving at the result. We have adopted the latter as a proper basis, because of the adjudications elsewhere in the same line: *State* v. *Virginia & T. R. R. Co.,* 23 Nev. 283 (46 Pac. 723); *People* v. *Keator,* 67 How. Prac. 277.

14. A series of years should be taken into consideration, and the average thereof in arriving at the net earnings as a standard of value, because the value of the road depends more upon its use as a permanent investment than upon any temporary use which may be made of it: *People* v. *Hicks,* 40 Hun, 598. We therefore base our estimate on the net earnings for the years 1891 to 1896, inclusive. We exclude 1897 for the reason that the county board of equalization was not, and could not have been, possessed of the proper data by which to have made an estimate for that year; and, to be consistent, we must put ourselves in the place of the board in that respect, and adopt the basis of valuation then available.

15. From these estimates of the net income per mile capitalization is made, showing the mileage value of the road. We adopt the 5 per cent. basis because the company's bonded indebtedness carries that rate of interest, thus showing that money may be had for investments in such property at that rate, and therefore may very properly stand as a basis for assessable value. The values for the several years named, capitalized on the basis suggested, are, in round numbers, as

follows (figures are taken from plaintiffs' Exhibit No. 42) : 1891, $12,440; 1892, $12,160; 1893, $15,320; 1894, $11,-400; 1895, $10,120; 1896, $5,360,—making a total valuation of $66,800, or an average value of $11,133 per mile. This should be reduced 50 per cent., because other real estate is assessed at 50 per cent. of its real value, which would show the mileage value to be $5,566. This shows the mileage value of the entire road, including its rolling stock, depots, and depot grounds, etc.

16. In order to ascertain the value of the roadbed, we must deduct the value per mile of these latter, the average of which for the six years named, taking the whole system into consideration, has been estimated at $1,028, which we take to be correct, as the data for each year are given. The remaining criterion for the assessment is the market value of the bonds and stock of the company. The stock appears to be of no appreciable value, so far as disclosed by the evidence, while the bonds are worth in the market but 75 per cent. of their face. The security standing behind these bonds includes not only the railroad, but the land grant and the guaranty of the Southern Pacific Company, which factors all conduce, of course, to their market value. The bonded indebtedness of the road is $29,040 per mile, which, at the market value, would make it worth $21,780 per mile.

17. We may now consider the assessments of the company's lands. For the years 1893 and 1894, Mr. J. L. Woolridge, assisted by his deputy, George Hoffman, made the assessment. The roll for 1894 shows that he assessed the company with 345,387.51 acres of congressional land at an aggregate of $247,852.92, or an average of 71 cents per acre. In 1895, Mr. Jackson assessed it with 360,048 acres of the same denomination at $272,539.17, or an average of 75 cents per acre. In 1896 he assessed the company with 371,-044.12 acres at $348,661, or nearly 94 cents per acre. It will be noted that there was an increase over 1895 of 10,996

acres, and an inspection of the roll will show that the increase in valuation is made up by a direct raise of values upon lands previously assessed, and by a high rate of assessment of lands newly listed. It is argued that the raise is mainly due to the assessment of the latter; that they are of superior quality, and should bear a high rate. But the argument proves too much, for an estimate will show that the aggregate increase was above $66,787, while the increase in acreage was but 10,996, thus showing a valuation of $6.07 per acre, which it must be admitted is unreasonable, and out of any just proportion to the assessed value of other lands of the kind. That the increase was arbitrary is manifest from the fact that other lands in the county were assessed at even a less rate per acre than in previous years. The indemnity lands were assessed for the first time in 1895, which assessment was made by Mr. Jackson, through John Grieve, his deputy. Grieve testifies that he visited the locality, and was there about two weeks engaged in listing and valuing 80,850 acres, which he rated at $1.72 per acre. The county board of equalization, consisting of J. R. Neil, Judge N. A. Jacobs, clerk, and T. A. Bryant, Jackson's deputy, by a majority vote, Bryant voting in the negative, and entering a protest thereto, reduced the rate to 75 cents, and the state board again to 72 cents. In 1896, Mr. Jackson assessed the company with 97,974 acres of indemnity land at $1.75 per acre, showing that he put a higher rate upon these lands than did his deputy the year previous; and it does not appear that he went upon, or in the vicinity of, any of them in making the assessment. A glance at the map will show the gross inequality of this assessment as compared with the assessments made by Woolridge and Hoffman. The indemnity lands lie outside of the 20-mile and within the 30-mile limit, while the congressional are wholly within the 20-mile limit. On tracing the line dividing the two limits southeasterly, commencing at the north boundary of township 34

south, range 1 east, we find the opposite sections cornering with each other rated as follows: Section 3, $2.50; section 9, 50 cents; section 11, $2.50; section 15, 70 cents; section 13, $2.50; section 23, $1; section 25 appears to be divided by the line, the portion lying to the east being rated at $2.50, and that on the west at $1. Continuing, they run, $2 to $1, $2 to $1.25, $1.25 to $1.25, $2.50 to 80 cents, $2.50 to 80 cents, $2.50 to $1.25, $2 to 50 cents (divided section), $2 to 45 cents (divided section), and $2 to 45 cents, and so on. So far as shown, the lands lying along this dividing line are of about the same quality, and there exists no plausible reason for such discrimination. The evidence is ample upon its face to demonstrate that the valuation and assessment of these indemnity lands was arbitrary and capricious, and should have been corrected by the county board of equalization.

The most thorough and painstaking assessment of the congressional lands seems to have been made by Woolridge in 1893, and his 1894 assessment was taken therefrom. He and his deputy visited every section of the county, and fixed the values as they went. True, Mr. Hoffman states that when Mr. Woolridge came to cast up the aggregate values he concluded that the assessment was too high, and reduced it by reclassification and scaling down, commencing at the place where he started, by an aggregate of $100,000; but he says that no reductions were made upon the lands lying to the east of the Willamette Meridian. Now, a very large, if not by far the greatest, proportion of the raise made by Jackson in 1896 was upon the lands lying to the east of this meridian, so the fact of Woolridge's change in this particular had little, if any, bearing upon Jackson's assessment. Mr. Jackson says that in assessing the congressional lands for 1895 and 1896 he took into consideration Woolridge's assessment, and made but few changes therein. This is in a manner true as to the 1895 assessment, but with respect to

that of 1896 the rolls disprove the assertion.  Now we have this result: The congressional lands were assessed and equalized in 1894 at 71 cents per acre; in 1895 they were assessed at 75 and equalized at 72 cents; while in 1896 they were assessed at about 94 cents per acre.  The indemnity lands were assessed in 1895 at $1.72 per acre, reduced by the county board of equalization to 75, and by the state board to about 72, cents.  In this connection reference may be made to the testimony of E. C. Pollock, who says he is acquainted with the railroad lands in Jackson and Josephine counties, and made an assessment of those in the latter county for the year 1897 at an average of 67 cents per acre, rating them, as he did other lands, at 50 per cent. of their real value; but he says further that the lands in Jackson County are somewhat better than in Josephine.  There is some proof, also, that the indemnity lands are of an appreciably higher grade than the congressional lands, owing to the presence of a larger proportion of sugar pine timber. Plaintiffs have produced much testimony showing estimates of the values of the entire grant, ranging from a nominal sum, if the purchaser had to pay the taxes, up to 50 cents per acre; while, on the other hand, the defendants have produced many comparisons of values between the assessment of these railroad lands and other nontillable lands in the county.  But neither of these standards impresses us as being calculated to produce the result designed by law.  These lands would not sell in a body at a voluntary sale at as large a figure as in parcels, which is the usual manner in which like property is disposed of.  Upon the other hand, this large body consists mainly of wild lands, wholly removed from any settlement, while those other lands which are assessed as nontillable lie in near approach to tillable lands, or to lands of superior quality, selected from the public domain before the railroad grant became available, and used in connection therewith.

38 Or.—40.

18.   It is not the province of this court to make assess-ments of property in the first instance, or to revise such as are made and equalized by the lawfully constituted boards; but, when it is confronted with the condition that an assess-ment and equalization has been arbitrarily and capriciously made, it must ascertain and determine, as nearly as prac-ticable, the appropriate value at which such property should be assessed, so as to require that justice be done the parties involved.   The estimate of the value of the roadbed placed upon it by the court below at $4,500 per mile appears to be fair and equitable, considering the earning capacity of the road and the rate at which other property in the county is assessed.   This estimate, under the circumstances and con-ditions, seems to be the best to which resort can be had.   And as it concerns the congressional and indemnity lands we are inclined to adopt, in the main, the assessment made by Wool-ridge and Hoffman, and the rate fixed by the board of equal-ization sitting prior to the one whose action is involved, as the most reliable and trustworthy.   We conclude, therefore, that those lands should be valued at 75 cents per acre as a whole.   This result, when the valuation of contract lands, rolling stock, depots, depot grounds, etc., upon which the company has paid its taxes, are considered, in comparison approaches very nearly to the market value of the bonds of the company when reduced by 50 per cent., as all other property in the county was reduced for the purpose of as-sessment; the value of the bonds at this measure being $10,-890, while the aggregate value of the roadbed, rolling stock, lands, etc., would amount to $11,326 per mile.   It may be said that the guaranty of the Southern Pacific Company con-duces materially to the appreciation of these bonds, but this factor of value is probably much more than offset by the fact that a greater proportion of the railroad lands, consid-ered according to mileage, lies within Jackson County.   It has been suggested that the main line should bear a higher

rate of assessment than the branch or ancillary lines, which is quite possible, but the evidence submitted does not warrant such discrimination. A similar question, under like conditions, was mooted in *People* v. *Hicks,* 40 Hun, 598, and the court held adversely to the contention. These conditions render a modification of the decree of the court below necessary, and the decree here will be that, upon payment by plaintiffs of the taxes levied upon the roadbed at a valuation of $4,500 per mile, and upon the lands at 75 cents per acre, within 20 days from this date, the injunction be made perpetual; otherwise, the complaint will be dismissed. The costs of the appeal will be taxed to the respondents.

MODIFIED.

Decided 24 June, 1901.

ON FIRST PETITION FOR REHEARING.

MR. JUSTICE WOLVERTON delivered the opinion.

By the petition of defendant for a rehearing of this cause our attention has been attracted to a manifest error in our deductions as it respects the value of plaintiffs' roadbed for assessment purposes. We adopted as a basis for the ascertainment of such value the net earnings of the railroad company averaged for a series of six years, because no other appeared under attending conditions sufficiently reliable from which to make the estimate. These earnings were capitalized at a basis of 5 per cent., adopting the estimates as shown by plaintiffs' table, known in the record as "Exhibit No. 42." The total of such capitalization for six years is $66,800, one-sixth of which, or $11,133, represents the value per mile of the roadbed, rolling stock, depot grounds, and improvements. The same table shows the value per mile of the rolling stock, depot grounds, and improvements, which for six years aggregate $6,172; the average being $1,028. Mr. Koehler testified that the figures representing these latter values were obtained by making a compilation of the assess-

ments in all the counties through which the line of the railroad extended and reducing it to a mileage basis, thus securing the average mileage value of the entire system in the state. Aside from this, the company paid taxes on the same property for the year 1896 on a much lower estimate, namely, about $840 per mile, thus showing that these figures were designed to indicate the actual assessable value. It was not necessary, therefore, to reduce them by 50 per cent. in order to bring them to a proper standard, and no such reduction is made by the tables as is the case respecting other estimates contained therein. It is proper, therefore, to deduct this mileage value, viz., $1,028, from the mileage value of the entire property, to get the value of the roadbed, which being done, gives a remainder of $10,105. Now, reducing this by 50 per cent., so as to place it upon the basis of other real property as assessed in Jackson County, we have $5,052.50 as a result. The same result will follow by taking the aggregate value of the whole for six years, $66,800, and subtracting the aggregate assessable value of the rolling stock and depot grounds for the same time, or $6,172, therefrom, then finding the average for one year, and reducing that by 50 per cent. The mistake in the original opinion consists in first reducing the mileage value of the whole by 50 per cent. and then deducting therefrom the full estimated assessable value of the rolling stock and depot grounds. The logic of the situation leads to but one result. Having determined that a capitalization of the net profits is a proper standard by which to estimate the value of the railroad, the deduction is resolved into a problem of mathematics, which, when rightly solved, can work out but one way. The decree of this court heretofore entered will therefore be modified, so as to require the plaintiffs to pay taxes upon the roadbed at a value of $5,000 per mile, and the petition for rehearing will be denied.

Rehearing Denied.

Decided 7 October, 1901.

ON SECOND PETITION FOR REHEARING.

A petition to modify the computation of values set out in the opinion rendered 24 June, 1901, was overruled. No opinion.                                        REHEARING DENIED.