Decided 7 December, 1903.

## ANKENY *v.* BLAKLEY.

[74 Pac. 485.]

TAXATION—ASSESSMENT BY BOARD OF EQUALIZATION.

1. Under Section 3080, B. & C. Comp., authorizing the county board of equalization to make the proper corrections on the assessment rolls in certain cases, and, among others, where property has not been assessed, it may cancel an assessment to one not the owner and itself assess the property to the true owner, and this without special notice, since it is the duty of every property owner to note the time fixed by law for the meeting of the board. In thus assessing property theretofore omitted or wrongly assessed, the board is not bound by the assessor's valuation, but may act on its own judgment, and such action by the board is not an increasing of the valuation of the property.

STOCK OF NATIONAL BANKS—CONSTITUTIONAL RESTRICTIONS.

2. As used in the Act of Congress of February 10, 1868, c. 7 (15 Stat. U. S. 34; U. S. Comp. St. 1901, § 5219), providing that the taxation of national bank stock shall not be at a greater rate than shall be assessed on other moneyed capital in the hands of individual citizens, etc., the term "rate" has relation to the assessment as a whole, and does not signify the mere percentage of levy upon any valuation adopted, so that any assessment which exacts from the owner of national bank shares a greater tax, in proportion to their actual value, than it does from the owner of other moneyed capital, is prohibited by the statute.

IDEM.

3. In U. S. Comp. St. 1901, § 5219, providing that the taxation of national bank stock shall not be at a greater rate than is assessed on other moneyed capital in the hands of individual citizens, the expression "moneyed capital in the hands of individual citizens" signifies capital employed in the operation of banking, and otherwise used as money as a source of profit.

LIABILITY OF NATIONAL BANK STOCK—KIND OF PROPERTY.

4. National bank stock is personal property, within the meaning of B. & C. Comp. § 3058, directing that personal property shall be assessed for taxation at its true value in cash.

MODE OF ASSESSING NATIONAL BANK STOCK—STANDARD OF VALUE.

5. Under B. & C. Comp. §§ 3042 and 3058, directing that shares of stock in banks shall be assessed "at their value," and that personal property shall be assessed at its "true value in cash," the value of shares of national bank stock, for the purpose of taxation, is the sum of money for which they can be actually sold, and not their book value, computed by adding to the par value of the paid-up stock the undivided earnings or profits of the bank. The two expressions, "value" and "true value in cash," mean the same thing.

EVIDENCE OF DISCRIMINATION IN ASSESSMENT.

6. The evidence does not sustain the charge that the assessment in question was unfair or illegal, or that the county board of equalization discriminated in making such assessment.

INEQUALITIES IN ASSESSMENT ROLLS—COLLATERAL ATTACK.

7. Irregularities or inequalities in various assessments, not resulting from the application of a wrong principle or an arbitrary rule intended to produce disproportionate results, must be corrected through the county board of equalization, and cannot be collaterally attacked by a suit to enjoin the collection of the tax.

DISCRIMINATION IN ASSESSMENT PROCEEDINGS.

8. Where shares of stock of various banks in a county were assessed to the banks, but, on objection of one bank, its assessment was changed, and the stock assessed to the stockholders, the erroneous assessments to the banks not objecting did not amount to a discrimination against holders of stock in the bank which did object.

From Umatilla: W. R. ELLIS, Judge.

Suit by Levi Ankeny against William Blakley, as sheriff of Umatilla County, and another, for an injunction to restrain the respondents from collecting a tax on certain bank stock owned by complainant.

The First National Bank of Pendleton, having been assessed on its paid-up capital stock by the assessor of Umatilla County as of March 1, 1899, applied to the county board of equalization on September 2d following to be relieved from such assessment; specifying, among other objections, that the stock was not legally taxable to the bank. Recognizing the validity of the objection, the board canceled the assessment, but at the same meeting assessed the stock to the several shareholders, residents of the county and nonresidents of the State, according to the holdings of each, and, among others, 290 shares to the plaintiff, at $46,617; being a large advance upon the valuation assessed to the bank. Feeling aggrieved at the action of the board, the plaintiff instituted this suit to enjoin the collection of

all taxes levied against his shares of stock, except such as would accrue upon a valuation of $76.94 per share, which he has tendered in full payment to the proper functionary. The gist of the complaint is that on March 1, 1899, there was subject to assessment in Umatilla County, Oregon, a large amount of moneyed capital, to wit, about $400,000, invested in securities, by way of loans, discounts, etc., and about $105,000 in shares of capital stock in private banking concerns, other than stocks in national banks; that all such moneyed capital was assessed, valued, and taxed at no greater rate than the par value of such securities, loans, and discounts, and the paid-up par value of such shares of bank stock, increased by the undivided profits and surplus; that the value placed upon shares of national bank stock for assessment purposes was so excessive, as compared with that placed upon such moneyed capital otherwise invested, as to amount to an illegal discrimination against the First National Bank of Pendleton and the owners and holders of shares of stock therein; "that the said assessor and county board of equalization knowingly, wilfully, and arbitrarily adopted a system of valuation, assessment, and taxation designed to operate unequally upon different classes of property similarly situated, and knowingly, wilfully, and arbitrarily adopted a system of valuation, assessment, and taxation whereby all the shares of stock in the First National Bank of Pendleton, and particularly the shares of this plaintiff therein, were assessed, valued, and taxed at a greater rate than other moneyed capital subject to taxation in said county and State, in the hands of individuals and banks other than national banks, and in competition with said First National Bank, was assessed, valued, or taxed."

The evidence shows that the shares of stock in the First National Bank were first rated on a cash basis at $250 per share; that when the board of equalization assessed them

to the individual holders the rate was raised to $320 per share, but that in each case a ratable reduction was made for the real estate held by the bank—that asset being assessed to it, and a further reduction of 40 per cent upon the balance, to make the valuation correspond with that placed upon other personal property for assessment purposes; that the rate of valuation to the stockholders was made upon the basis of what plaintiff paid for a block of stock that was sold in Portland by the executor of the Failing estate, and that what is designated and known as the "Ankeny Trust Fund" was not taken into consideration, as the board had no knowledge of it; that in assessing notes and accounts of private investors, other than banks, the assessor valued them at 40 per cent less than their face, taking no note of unpaid accumulated interest; that the Farmers' Bank of Weston was assessed on real property at $18,720, and on 300 shares of its capital stock at $6,850, which was reduced by the board of equalization to $5,268; the Pendleton Savings Bank, on real property at $21,975, and on 500 shares of capital stock at $27,315; and the Bank of Milton on real property at $4,595, and on 254 shares at $7,871. It was further shown that at the time of the assessment the Pendleton Savings Bank had a paid-up capital of $50,000, with a surplus of $24,650; that shares of stock were sold about the time for $135 per share, and that their book value was $149.20; that the Bank of Milton had a paid-up capital of $25,400, and net undivided profits of $11,070.25; that the book value per share was $104.60, and that the cash value was a trifle less; that the Farmers' Bank of Weston had a paid-up capital of $31,350, and net undivided profits of $7,001.47, and that the stock would have sold at the value represented by these figures if it had been offered; that the First National Bank had a paid-up capital of $70,000, a surplus fund of $18,-

287.81, undivided profits of $21,683.25, and was assessed on its real property at $24,935; that its stock was worth from $335 to $350 per share; that at a directors' meeting held January 5, 1894, a resolution was adopted as follows:

"Whereas, owing to the unfavorable season for crops, low prices, and the unprecedented damage to crops during the harvest, this bank has been compelled to accept a large amount of real estate and chattel mortgage security, the paper thus secured cannot be depended on for early payment, and the further fact that our shareholders are now taxed upon our surplus fund to such an extent as to become burdensome: Therefore, be it resolved that we declare a dividend of 230 per cent of our capital stock of $70,000, payable out of our surplus fund, and that first there be deducted from said dividend the balance due profit and loss account, to wit, $4,839.94, and the balance, $156,160.06, be paid to Levi Ankeny, trustee for all the shareholders of this bank proportionately to their holding of the stock in said bank, and that said dividend, known as 'Dividend No. 22,' be payable, first, in such notes of such bank as are secured by mortgage; second, in such notes as it is not probable will be paid within the next eight months."

The condition of the trust fund mentioned in the resolution was not disclosed at the time of the assessment. The findings of fact and law being favorable to the defendants, a decree was rendered dismissing the complaint, from which the plaintiff appeals.          AFFIRMED.

For appellant there was a brief over the names of *Carter & Raley* and *Cotton, Teal & Minor*, with an oral argument by *Mr. Joseph N. Teal* and *Mr. James H. Raley.*

For respondents there was a brief over the names of *Thomas G. Hailey*, District Attorney, and *Balleray & Mc-Court*, with an oral argument by *Mr. Hailey* and *Mr. John J. Balleray.*

MR. JUSTICE WOLVERTON, after stating the facts in the foregoing terms, delivered the opinion.

1. We will consider first the contention of counsel that the shares of bank stock were assessed when they were listed upon the roll in the name of the bank, and a valuation placed upon them by the assessor, and that thereafter the county board of equalization was without power or competent authority to put a higher valuation upon them, without notice to the shareholders. It is provided (B. & C. Comp. § 3080) that if it shall appear to the board of equalization that there are any lands or other property assessed twice, or in the name of a person or persons not the owner thereof, or assessed under or beyond its actual value, or any lands, lots, or other property not assessed, the board shall make the proper corrections, and (by B. & C. Comp. § 3081) that the board shall not increase the valuation of any property so assessed without giving to the person in whose name it is assessed at least three days' notice in which to appear and show cause why the valuation should not be increased, but that such notice shall not be necessary if the person appear voluntarily, and be there personally notified by a member of the board that his property, or some part, is assessed below its actual value. If any property, therefore, is assessed in the name of a person not the owner, or under or beyond its actual value, the board is authorized to make the proper corrections. But how? If a valuation is to be increased, the person in whose name the property is assessed must have three days' notice. But what interest has a person in property assessed to him that he does not own? His only concern is to be relieved of the assessment, and whether the valuation is to be raised or lowered cannot affect him further, so that, if he secures a release from such assessment, his sole object has been subserved. The bank in the present instance appeared voluntarily and objected to the capital stock of the institution being assessed to it, and the board, realizing that the property had been assessed to the wrong person, re-

lieved it of the assessment. Its object was therefore at an end, and what reason was there left for notifying the bank to show cause why the valuation should not be increased? It was the duty of the board, however, to change the assessment. This it did by relieving the bank, which was present, and assessing the stock to the shareholders; they being the persons to whom the shares were properly assessable. Now, the fact that the stock happened to be listed in the name of a person not the owner affords no reason why the true owners, when the correction is made and the stock is assessed to them, should have notice that the assessor had primarily listed it below its actual value, and the law does not require it. As to them, it never had been assessed; hence the act was not an increase in a valuation fixed by the assessor. The board of equalization listed it to them upon the roll for the first time, and put a valuation upon it, thus effectuating an initial assessment; and of this they had sufficient legal notice through the procedure prescribed in assessment matters. The board was competent thus to make the initial assessment, and the stockholders were entitled to no other notice than the law gave them of the existence of a board of equalization, its duties and powers, and of the time of its meeting to examine the roll and make the proper corrections : *Oregon & W. M. Sav. Bank* v. *Jordan,* 16 Or. 113 (17 Pac. 621); *Oregon & C. R. Co.* v. *Lane County,* 23 Or. 386 (31 Pac. 964); *Ramp* v. *Marion County,* 24 Or. 461 (33 Pac. 681); *Dayton* v. *Board of Equaliz.* 33 Or. 131 (50 Pac. 1009); *Kirkwood* v. *Ford,* 34 Or. 552 (56 Pac. 411); *Southern Oregon Co.* v. *Coos County,* 39 Or. 185 (64 Pac. 646).

2. This brings us to the contention most strenuously urged—that the assessor and the board of equalization purposely, willfully, and arbitrarily adopted a vicious system of valuation, assessment and taxation, with a view to discriminating against investments in shares of the capital

stock of the First National Bank, and in favor of other
moneyed capital in the hands of individuals and private
banking concerns within the county.   Incidentally it is
urged upon the other hand that a court of equity is with-
out jurisdiction to determine the controversy, because, it
is insisted, the plaintiff has a plain, speedy, and adequate
remedy at law.   Of this, however, we will not stop to in-
quire further than to observe that the allegations of the
complaint seem to bring the case within the purview of
many cases entertained in equitable jurisdictions, both
State and Federal, and especially the latter.   See *Oregon
& C. R. Co.* v. *Jackson County*, 38 Or. 589 (64 Pac. 307),
and authorities cited next below.   Our statute provides that
all shares of capital stock of banks located in the State
shall be taxed at their value to the owners thereof in the
county, city, or district in which they reside, and all shares
standing in the names of persons residing out of the State
shall be taxed to such persons in the city, county, or dis-
trict where the bank is located : B. & C. Comp. § 3042.   By
the Federal statute, the legislature of each State may de-
termine and direct the manner and place of taxing all the
shares of national banking associations located within its
borders, subject to two restrictions only—that the taxation
shall not be at a greater rate than is assessed upon other
moneyed capital in the hands of individual citizens of the
State, and that the shares of any national banking asso-
ciation owned by nonresidents of any State shall be taxed
in the city or town where the bank is located, and not else-
where : U. S. Comp. St. 1901, § 5219.   This latter statute
has received explicit construction by the Supreme Court
of the United States, so far as it has application here.   The
term "rate," as employed therein, has relation to the assess-
ment as a whole, and was not intended to signify the mere
percentage of levy upon any valuation that the authorities
might see fit to adopt.   The principle announced is that

the valuation is only one, but an essential, step in the process of making a valid assessment; that an inequality in the rate of valuation necessarily produces an inequality in the rate of assessment or taxation; and that it is this inequality or discrimination that the statute inveighs against, so far as it concerns the taxation of shares of stock in national banks as compared with the taxation of other moneyed capital coming in competition therewith. Any system adopted for the assessment of taxes, therefore, that exacts from the owner of shares in a national bank a greater tax in proportion to their actual value than it does from the owner of other moneyed capital similarly invested, results in the taxation of such shares at a rate in excess of that placed on other moneyed capital, and falls within the inhibition of the law: *People* v. *Weaver*, 100 U. S. 539; *Pelton* v. *National Bank*, 101 U. S. 143; *Supervisors* v. *Stanley*, 105 U. S. 305; *Hills* v. *Exchange Bank*, 105 U. S. 319; *Evansville Bank* v. *Britton*, 105 U. S. 322; *Boyer* v. *Boyer*, 113 U. S. 689 (5 Sup. Ct. 706).

3. The chief purpose of Congress in placing a limitation upon the State's taxation of investments in national bank shares was to prevent the State from creating and fostering through its taxing power an unequal and unfriendly competition, by favoring other individuals or institutions engaged in similar investments of capital; the expression "moneyed capital in the hands of individual citizens" being interpreted, in brief, as signifying capital employed in the operations of banking, and otherwise used as money as a source of profit: *Mercantile Bank* v. *New York*, 121 U. S. 138 (7 Sup. Ct. 826); *Aberdeen Bank* v. *Chehalis County*, 166 U. S. 440 (17 Sup. Ct. 629).

4. Having now ascertained the meaning and purpose of Congress in the adoption of Section 5219, U. S. Comp. St. 1901, we will determine what standard of value should be adopted for the assessment of shares in bank stock, it be-

ing insisted that the measure of such value is the face or par value of the paid-up capital stock, increased by the undivided earnings or profits of the bank; that, while other species of personal property may fluctuate, and its value be best determined by what it will bring in the market, the value of shares of bank stock remains constant and invariable, so long, at least, as the capital remains intact and unimpaired and is capable of exact ascertainment; and that, therefore, in view of the statutory directions that such shares shall be taxed "at their value," it was intended that the book value should be the test, and not the "true value in cash," as it is elsewhere directed that personal property shall be valued for the purpose of taxation: B. & C. Comp. § 3058.   In this we are unable to agree with counsel.   The section just noted prescribes that "all personal property not exempt from taxation shall be valued at its true value in cash."   Shares of bank stock are personal property, and there is nothing in the language employed by Section 3042, B. & C. Comp., to betoken or signify an intention on the part of the legislature to set a different standard of value for that particular species of personal property, or that it should constitute an exception to the general provision, and, not being money, which determines its own value, it must likewise be measured as other personal property—at its true value in cash.

5. Mr. Justice HOLMES, while on the supreme judicial bench of the State of Massachusetts, in discussing the meaning of the expression "fair cash value," which is the equivalent of "true value in cash," for the purpose of taxation, with reference to shares of stock in a national bank, says: "Value refers to exchange.   The cash value of an article is the amount of cash for which it will exchange in fact. That amount depends on the opinion of the public of possible buyers, or of that part of it which will pay the most. If, in their opinion, the stock is worth only $102 per share

—if that is all that the stock will sell for—it is vain to show that the net value of the property of the corporation, that is to say, the opinion of the public about a chief component element of the value of the stock, if uncontrolled, logically leads to a different value for the stock. It has been recognized judicially that the value of the property and the value of the stock might differ, for reasons which have been found to exist in this case. * * The difference in the value found by him [the commissioner] depends upon whether it is assumed that the corporation was to continue its business, or was to be wound up. If it was to continue its business, $102 was the fair and market value for a share; that is to say, $102 was the full amount of cash that could be got or ought to be got for a share in that bank, its property and prospects being what they were. The bank actually was to continue its business. Therefore that was the actual fair cash value of its shares. What they would have been worth in a different state of facts, if the bank had come to a stop, does not matter. Actual values are based upon existing states of fact, not upon hypotheses; and the actual value of shares in a going concern depends not only upon its property, but also upon its prospects, since shares both represent property and prospects": *National Bank of Commerce* v. *New Bedford*, 155 Mass. 313, 315 (29 N. E. 532, 533). This case is so apt that we are disposed to follow it, as indicating the correct method for ascertaining the true value in cash for the purpose of taxation, within the purview of our statute, as it relates to shares of stock in banking concerns while continuing in the business for which they were organized.

6. We can now readily determine from the evidence whether the system of assessment and taxation adopted by the assessor and board of equalization, and applied in the assessment of the bank stock to plaintiff and other moneyed capital investments within the county, was vicious

in principle, and calculated to discriminate against the
First National Bank or its shareholders, for such is the
ground upon which the suit is based. As it respects the
assessment of the investments of moneyed capital by in-
dividuals, they were valued at 60 per cent of their face, so
that they, with whatever accumulations of interest there
might be, were considered to be worth par, since, as a
general rule, the valuations of all property, whether real
or personal, were made on the basis of 40 per cent reduc-
tion of the cash value. In assessing the banks, the real
estate in every instance was assessed to the bank, and
rightfully so. The Farmers' Bank of Weston was assessed
upon real property at a valuation of $18,720, and upon its
bank stock at $5,268. The testimony shows that its stock
was worth in the market what its paid-up capital and un-
divided profits or book value would indicate, namely,
$127.83 per share, or $38,349. Deduct 40 per cent from
this cash value estimate, so as to put it upon the basis of
other assessments, and we have $23,010; but it was taxed
upon a valuation of $23,988, or $978 above the initial cash
value basis, allowing for the deduction. The Pendleton
Savings Bank was assessed upon its real property at a
valuation of $21,975, and its bank stock at $27,315, aggre-
gating $49,290. From the testimony we find that the cash
or market value of its stock was $135 per share, or for the
whole 500 shares $67,500. The book value—that is, con-
sidering the paid-up capital and undivided profits—ex-
ceeded this, being at the rate of $149.20 per share. Reduc-
ing the total valuation by 40 per cent to bring it to the
basis upon which other property was assessed, we have a
balance of $40,500, which shows an excess assessment to
the savings bank of $8,790. Upon a like reasoning from
the facts established, taking its stock to be worth $100 per
share, as the evidence indicates, it will be seen that the
property of the Bank of Milton was not valued as high as

it should have been by $2,774. Now, by applying the same
test to the assessment of the First National Bank and its
shareholders, we find that they have fared quite as well as
other investors of moneyed capital, excepting only the
Bank of Milton. The bank was assessed upon its real es-
tate at a valuation of $24,935, which it may be observed
was its reduced valuation from the cash basis to bring it
to that at which other real property was assessed in the
county, and the shareholders were assessed by the board
of equalization upon their shares of stock at the rate of
$160.74 and 8 mills, to be exact, per share. This can be
ascertained by a simple deduction made from the assess-
ment of plaintiff's stock as it appears upon the tax roll,
which is an exhibit in the case. This, of course, is the
reduced valuation to bring it to the basis at which other
personal property was assessed. At this rate the assessable
value of all the stock of the bank, there being 700 shares,
would be $112,523.60. Add to this the real property val-
uation, and we have the total valuation at which the prop-
erty of the bank and its shares would have been assessed
if the stock of all the shareholders had been listed, namely,
$137,458.60.

Now, the stock was worth in the market, to say the least,
$320 per share. The plaintiff, who was at the time the
president of the concern, and assuredly fully cognizant
of its true financial condition, purchased a block at that
figure; and, considering his recognized business sagacity,
it is not at all probable that he paid more than its real
worth—in fact, we must assume that the purchase was a
good business investment, or he would not have made it.
But beyond this, the testimony of Judge Hartman shows
that the stock was actually worth from $335 to $350 per
share. He was qualified to testify on the subject, as he
was managing Mrs. Sturgis' business, who was the owner
of 110 shares, was assessed thereon at the same rate as

plaintiff, and has paid the taxes in full accruing by reason thereof. At \$320 per share, the aggregate valuation of the 700 shares would be \$224,000. Reduce this by 40 per cent, and we have a valuation for assessment purposes upon the basis at which other property in the county was assessed of \$134,400, which shows an excess assessment of \$3,058.60. If, however, a primary cash valuation of \$335 per share—Judge Hartman's lowest estimate—be adopted, the proper deduction would show that the stock has been assessed below the standard by \$3,241.40, and there is no reasonable cause for plaintiff to complain.

The Ankeny Trust Fund has no place in the consideration, and could only be material upon the hypothesis that the proper standard of valuation was the par value of the stock, increased by the undivided profits, as contended for by plaintiff's counsel; and the question would then arise whether the fund should still be considered undivided profits, or a completed dividend to the shareholders. But this, we have seen, is not the appropriate standard, within the intendment of the legislature, which at once puts an end to its relevancy. It was not taken into account by the taxing officers, as, at the time the board of equalization made the assessment of plaintiff's shares to him, it had no knowledge of such a fund. Nor did the board adopt, as the complaint charges and counsel insist, as a standard of valuation for moneyed capital investments in shares of all bank stock, excepting national, the par value of the paid-up stock, increased by the surplus and undivided profits. The just and sincere purpose of the board, as the evidence clearly indicates, was to get at the value of such shares of stock in cash, and it applied the same rule for the valuation of plaintiff's shares of stock in the First National Bank. True, when we figure out precisely the results from the testimony here adduced, there appear to be some inequalities in individual cases; but they do not arise from

the standard of valuations adopted, or from any vice in the system of assessment and taxation employed, and must be attributed wholly to some misinformation or mistake in judgment of such officers in determining values under a correct rule, as the assessment of individuals proceeded.

7. As was said by Mr. Justice FIELD in *Stanley* v. *Supervisors of Albany*, 121 U. S. 535 (7 Sup. Ct. 1234, 1239): "Absolute equality and uniformity are seldom, if ever, attainable. The diversity of human judgments, and the uncertainty attending all human evidence, preclude the possibility of this attainment. Intelligent men differ as to the value of even the most common objects before them—of animals, houses, and lands in constant use. The most that can be expected from wise legislation is an approximation to this desirable end, and the requirement of equality and uniformity found in the constitutions of some States is complied with when designed and manifest departures from the rules are avoided." For mere irregularities or overvaluations which do not result from the application of a principle unwarranted by law, or a vicious system designed or calculated to operate unequally upon a large class of taxpayers, a remedy is provided by statute, through resort to the board of equalization, which is deemed speedy and adequate, and a court of equity will not intercede. The action of the assessing officers "is judicial in its character," says the eminent jurist in the case just cited. "They pass judgment on the value of the property, upon personal examination and evidence respecting it. Their action being judicial, their judgments in cases within their jurisdiction are not open to collateral attack. If not corrected by some of the modes pointed out by statute, they are conclusive, whatever errors may have been committed in the assessment." Our own decisions are to the same purpose: *Oregon & W. M. Sav. Bank* v. *Jordan*, 16 Or. 113 (17 Pac. 621); *Ramp* v. *Marion County*, 24 Or. 461 (33

Pac. 681); *Oregon & C. R. Co.* v. *Jackson County*, 38 Or. 589 (64 Pac. 307).

8. Nor does the mere fact that the shares of stock in the other banking concerns were assessed to the banks, and the stock of the First National Bank to its shareholders, amount to a discrimination of which the plaintiff can complain. The standard of valuation, as we have seen, was the same as applied to all; and while in one instance the shareholders were to pay the taxes directly, and in the other through the banks, this can now make no difference to the plaintiff. It seems it had been the custom previous to this time to assess all the stock to the banks, which was done at their instance and request, as a matter of convenience to them; and there probably would have been no divergence from the custom, had not the First National Bank insisted that it be relieved of the assessment. The assessment of the stock to the other banks was invalid, of course, but no one challenged it on that account, and the banks and their stockholders have acquiesced therein; and, it not having been shown to the contrary, we must assume that the taxes have been paid. In reality, therefore, there exists no such inequality between the taxation of the First National Bank and its shareholders, and that of the other banks and their stockholders, or of other moneyed capital within the county, as a court of equity will relieve against. There is not the slightest evidence in the record that the assessor, the board of equalization, or any member thereof, acted capriciously or arbitrarily, with a view to taxing plaintiff's shares of stock at any greater rate than was adopted for the taxation of other moneyed investments, nor was the rate of valuations adopted in any degree calculated to lead to such vicious discrimination. The allegations of the complaint, therefore, are not established by the evidence, and the decree of the trial court in dismissing it was properly rendered.          AFFIRMED.