Argued June 17, reversed July 14, rehearing denied September **8,** 1914.

# DAVIS *v.* MITCHELL.

(142 Pac. 788.)

**Pleading—Complaint—Construction—Inference.**

1.   Where a complaint is not demurred to, and the defendant answers, and no objection is made until the trial or on appeal, it is liberally construed, and is entitled to all intendments in its favor that arise after verdict, and every reasonable inference will be invoked to sustain it after trial has commenced.

**Exchange of Property—Fraud—Evidence Sufficient to Entitle Rescission.**

2.   Evidence *held* to show that, to induce an exchange of property, defendants made false representations as to the extent of their apartment house business and of the property in the apartment house; that the plaintiffs had no knowledge of the apartment house business; that they believed the representations and relied on them; and that the representations were known to defendants to be false, entitling the plaintiffs to rescind the transaction.

> [As to the difference between an exchange of properties and a sale, see note in 94 Am. St. Rep. 227.]

**Contracts—Validity—Fraud—Elements—Diligence.**

3.   When a person, to defraud another, makes false representations as to material facts, and the person to whom they are made believes them and is induced to enter into a contract to his injury, the person making the representations cannot defeat a suit to rescind the contract by showing that the person defrauded could have ascertained that such representations were false by the exercise of diligence, and considering the fraudulent statements made by defendants, plaintiffs are entitled to a rescission of the contract for exchange.

**Cancellation of Instruments—Right to Relief—Conditions Precedent —Restoration of Consideration.**

4.   While a person seeking the remedy of cancellation must do equity, and as a general rule the parties must be placed *in statu quo*, yet, if the act of the fraudulent party renders restoration of the consideration impossible, the equitable remedy will not be defeated.

> [As to right of grantor to cancellation of deed on ground of misrepresentation by grantee as to condition, value, etc., of property, see note in Ann. Cas. 1912A, 405.]

**Cancellation of Instruments—Condition Precedent—Consideration— Restoration—Sufficiency of Offer.**   ·

5.   An offer to restore the consideration precedent to a suit to rescind need not be a technical tender such as would be required as a condition precedent to an action at law.   In the case at bar a proper offer was made before the suit was commenced.

From Yamhill: WILLIAM GALLOWAY, Judge.

Department 2. Statement by MR. JUSTICE RAMSEY.

This is a suit in equity by J. Monroe Davis and Edythe R. Davis against May C. Mitchell, E. D. Mitchell and W. P. Sinnott, for rescission of a contract by which the plaintiffs conveyed a farm and certain personal property to the defendants in consideration of the conveyance by the defendants to the plaintiffs of the furniture, etc., which the defendants owned in an apartment house in the City of Portland, etc. The plaintiffs ask that the exchange of said property and all deeds and other papers executed in connection therewith be canceled and rescinded, etc. The court below rendered a decree dismissing the plaintiffs' suit, etc. The plaintiffs appeal. The facts appear in the opinion.                REVERSED. REHEARING DENIED.

For appellants there was a brief and an oral argument by *Mr. C. W. Garland.*

For respondents there was a brief over the names of *Mr. Raphael Citron* and *Messrs. Murphy, Brodie & Swett,* with oral arguments by *Mr. Citron* and *Mr. Dan R. Murphy.*

MR. JUSTICE RAMSEY delivered the opinion of the court.

This is a suit for a rescission, on the ground of fraud of an exchange of property and of the deed of conveyance, bills of sale, and other papers executed to effectuate and carry out said exchange, etc.

There appears to have been no demurrer to the complaint or to either of the answers. The defendants Mitchell demurred to each of the three separate paragraphs of the reply of the plaintiffs to the answer of the defendants Mitchell on the ground that neither of

said paragraphs states facts sufficient to constitute a reply. This reply was filed on December 5, 1912, and on December 12th counsel for the plaintiffs and the defendants filed a stipulation that certain stated amendments be considered made to the reply, and that the reply, as thus amended, be considered subject to the demurrer referred to *supra,* and that no objections to the form of the reply would be made. We fail to find that said demurrer was ruled upon by the court below, or that the attention of that court was called to it.

The complaint was filed on September 30, 1912. It appears therefrom that the plaintiffs are husband and wife, and that the defendants Mitchell also are husband and wife. It appears also, from the complaint, that the defendant W. P. Sinnott is one of the owners of the building in which the apartment house was conducted, and that the chattel mortgage for $2,500, made by the plaintiff J. Monroe Davis, was made to the defendant May C. Mitchell and to him jointly.

The defendants on July 1, 1912, and for about 17 months prior thereto, were conducting an apartment house on the two upper floors of what is known as the Peninsula Apartments at No. 1135½ Albina Avenue, in the City of Portland. The building belonged to the defendant Sinnott and others, and was leased to the defendants Mitchell for an apartment house, and the defendants owned, at the time of the exchange, the furniture and fixtures therein, and mentioned in Exhibit "A" of the complaint. Part of the furniture and furnishings had belonged to the defendant Sinnott before the date of the exchange hereinafter mentioned.

On July 1, 1912, and for some time prior thereto, the plaintiffs were the owners in fee simple of the following described real property in Yamhill County,

State of Oregon, to wit: Beginning at the northwest
corner of the Laban S. Morin donation land claim,
claim No. 44, notification No. 1644, in township 5 south,
range 3 west of the Willamette meridian, in said
county and state; thence running east 28.03 chains;
thence south 3 degrees west, 34.01 chains; thence west
30.54 chains to the west line of said donation land
claim; thence north 6 degrees 45 minutes east, 34.20
chains to the place of beginning—containing 100 acres,
more or less, together with certain farm implements,
tools, machinery, livestock, crops, household furniture,
and other personal property, all of which property,
except said land, being described in Exhibit "B" of
the complaint. That all of said real and personal
property, so owned by the defendants, was free from
any encumbrance, except a mortgage thereon for the
sum of $4,500, and interest thereon from February 6,
1912, at the rate of 6 per cent per annum, and one half
of the taxes for the year 1911. The complaint alleges
that all of said real and personal property was of the
reasonable value of $16,000, and that the plaintiffs, on
said 1st day of July, 1912, and for some time prior to
that date, resided on said land.

The complaint alleges *inter alia* that prior to said
1st day of July, 1912, the defendants Mitchell caused
said apartment house to be advertised for sale or ex-
change, and represented the income thereof to be $350
a month net; that the plaintiffs, seeing said advertise-
ment, were induced thereby to go to Portland and call
upon said defendants at said apartment house, where
they were then living; that the plaintiffs and the de-
fendants entered into negotiations regarding the pur-
chase of said apartment house property, and in the
course of negotiations the defendants represented to
the plaintiffs that they were the owners of all furni-

ture and furnishings of said apartment house; that said defendants, in order to induce plaintiffs to purchase said property from them, then and there purposing to cheat, wrong and defraud the plaintiffs, expressly represented and assured plaintiffs that the value thereof was $16,000; that there were 44 apartments, and that 34 of the same were fully furnished; that the furniture and furnishings in each of said 34 apartments consisted of a half dozen pieces each of saucers, cups, dinner plates, pie plates, soup plates, sauce dishes and glasses, two platters, one sugar-bowl, one cream-pitcher, one salt-and-pepper, two frying-pans, two stew-pans, two stew-kettles, one bread-pan, one egg-beater, one potato-masher, one butcher-knife, one teapot, one wash-pan, two pie tins, one coffee-pot, one tea-kettle, two irons, two lids, one rolling-pin, one sieve, one dust-pan, one broom, one mop, one can-opener, one slop-bucket, one wash-tub, and one wash-board, and also a full set of furniture and bedding for housekeeping; that said apartment house was a grand investment; that said defendants had operated the same as an apartment house and had taken in, in gross earnings, from January 1, 1911, to May 1, 1912, the sum of $14,580.40; that said defendant W. P. Sinnott owned the building in which said apartment house property was situated; that said defendants paid him one half of the gross earnings per month as rent for said property, and after paying all expenses of operating and carrying on said apartment house, which amounted to not to exceed $119.88 per month, on an average for said period of 16 months, the net earnings and profits of said defendants for said period averaged $335.75 a month; that the house was fully occupied during all of the period from September, 1911, to February, 1912, and that there was a large waiting list;

that during the period from September 1, 1911, to February 1, 1912, no tenants left said house; that the least amount ever taken in by said defendants as earnings of said house, during any one month, was the sum of $750, during the month of August, 1911, and that during the month of May, 1912, the gross earnings were $840, and that there were only four apartments vacant on May 27, 1912; and that all of the tenants were permanent.

The complaint alleged also:

"That said plaintiffs, believing said representations of said defendants to be true, and wholly relying thereon, agreed to purchase the apartment house, furniture and furnishings from said defendants for the sum of $16,000, payable as follows: The said plaintiffs would pay to said defendants Mitchell the sum of $2,000 in cash, and said defendants agreed to accept in part payment of said purchase price the above-described farm in Yamhill County, Oregon, together with all the personal property situated thereon as particularly described in Exhibit 'B' attached, at the agreed valuation of $11,500, and that the same should be conveyed to defendants subject to the existing mortgage thereon in the sum of $4,500, as aforesaid, and that plaintiffs would execute and deliver to said defendants a chattel mortgage upon a portion of the personal property of said apartment house to be sold and delivered to plaintiffs, to secure the sum of $2,500, balance of the purchase price of said apartment house property; that, in accordance with said agreement, the said plaintiffs on the 1st day of July, 1912, executed and delivered to said defendants a deed of conveyance of said real property herein described as the property of plaintiffs, in Yamhill County, Oregon, which deed is a general warranty deed free and clear of all encumbrances excepting as to said mortgage of $4,500 and interest thereon from February 5, 1912, and one half of 1911 taxes, which deed was thereafter, and on July 3, 1912, duly recorded by said defendants in Book

62, page 626, records of deeds of said Yamhill County, Oregon, and then and there delivered to said defendants all of the personal property situated upon said real property in said Yamhill County, Oregon, and which is more particularly set forth and described in said Exhibit 'B' hereto attached and made a part hereof, reference to which is hereby made, and said defendants then and there entered into and took possession and control of the same, and said plaintiffs paid to said defendants the full sum of $2,000 in cash, lawful money of the United States, and executed and delivered to said defendants May C. Mitchell and W. P. Sinnott a chattel mortgage upon a portion of said apartment house property to secure the balance of the purchase price, and at the same time executed and delivered to said defendants May C. Mitchell and W. P. Sinnott the plaintiffs' promissory note for $2,500, being the amount of said balance, payable in monthly installments of $100 per month, with interest at 6 per cent per annum, which chattel mortgage said defendants caused to be recorded in Book 57 at page 453, records of chattel mortgages, of Multnomah County, Oregon. That it was also agreed that plaintiffs should execute and deliver to said defendants their promissory note for $108.75 on account of the interest due on the $4,500 mortgage on the Yamhill County property, which note of $108.75 was duly executed and also delivered by said plaintiffs to said defendants. That said defendants thereupon, and upon receipt of all of said property, deed, notes, and mortgage, made, executed and delivered to plaintiffs the personal property described in Exhibit 'C' their certain bill of sale of said property and represented to be contained in said apartment house; a more complete description of same being set forth and described in Exhibit 'A' hereto attached and made a part hereof, reference to which is hereby made. That after the plaintiffs had so purchased said apartment house, property of the said defendants, as aforesaid, and entered into possession thereof, and had an opportunity to become acquainted with the true condition of same,

said plaintiffs ascertained that they had been deceived and defrauded by said defendants. That said representations, upon which plaintiffs had relied to make and carry out said sale, were false and untrue. That there were only forty-three apartments in said apartment house and only thirty-four were furnished at all. That said thirty-four apartments represented to be fully furnished, as aforesaid, were not fully furnished. That the following described personal property was missing, and said defendants well knew said property was missing, or by the exercise of reasonable care could have so ascertained the fact, to wit: Thirty-two saucers, thirty-six cups, twenty-two dinner plates, twenty-six pie plates, fifty-seven soup plates, thirty-five sauce dishes, eleven platters, two sugar-bowls, one cream-pitcher, eight salt-and-peppers, one extra pepper, sixty-eight glasses, one frying-pan, twenty-one stew-pans, six stew-kettles, two bread-pans, eleven egg-beaters, ten potato-mashers, nine butcher-knives, twenty paring-knives, one teapot, three wash-pans, eleven pie tins, twenty-four coffeé-pots, one tea-kettle, six irons, six lids, two rolling-pins, six sieves, three dust-pans, six mops, eleven can-openers, five slop-buckets, and one white spread. That the value of said apartment house property was not $16,000 as represented, or any sum in excess of $6,000. That the gross earnings of said apartment house never equaled said sum of $14,580.50 from January 1, 1911, to May 1, 1912, and the net earnings or profits never equaled said sum of $335.76 per month, or any sum approximating said amount. That said apartment house has made no profits for the months of July and August, 1912. That said house was not fully occupied during all the period from September, 1911, to February, 1912, and that during said period there were a large number of vacancies and a large number of tenants moved from the premises. That it is not true that the least amount defendants took in as earnings of said apartment house, for any one month, was $750, and that the fact is that a much less sum would be correct and true. That the gross earnings did not equal the sum of $840

for the month of May, 1912, and that many more than four apartments were vacant on said May 27, 1912. That all said tenants were not permanent, for the reason that when plaintiffs discovered the true facts regarding the same, during the month of July there were more than fifteen vacant apartments. That it was impossible to ascertain the true facts and condition of said property and the earnings of said business until the consummation of said sale and said plaintiffs had no opportunity to investigate the premises, and that said facts rested wholly with said defendants, who purposely and intentionally concealed same from the plaintiffs. That the principal object of plaintiffs in purchasing said apartment house property of said defendants was to invest their life's savings in a good paying property which they could personally operate and carry on, and the sole inducements of the plaintiffs to enter into and carry out said contract with said defendants for the purchase of their property were the said representations of said defendants were true and said apartment house was earning at least $335.76 per month, and that all the property represented to be on hand would be found. That the difference between the actual value of said apartment house property so sold to these plaintiffs, in the condition in which the same was when so delivered and in which condition it still is, and the real value, if the same had been as represented by said defendants, is not less than $10,000. That said plaintiffs, as soon as they discovered and became convinced of the falsity of the aforesaid representations of defendants regarding said apartment house property, its business and earnings, and ascertained the true state of affairs, repudiated said sale and offered in good faith to rescind the entire contract of sale and purchase of the premises between said plaintiffs and defendants, made as aforesaid, and for that purpose made, executed, and acknowledged a good and sufficient bill of sale of all the personal property received from said defendants, as aforesaid, and prior to the commencement of this suit tendered the same to said defendants and

offered to give them the full and complete possession of said property and every part thereof, the same being the identical property received from said defendants, as aforesaid, by these plaintiffs, and then and there demanded of defendants a full rescission of said contract of sale, purchase and trade of the properties aforesaid, and offered to return to defendants all and every part of the premises in as good shape and condition as they were in when received by plaintiffs, save and except as to said chattel mortgage of $2,500, which plaintiffs gave to said defendants May C. Mitchell and W. P. Sinnott, as aforesaid, and demanded of said defendants the restoration and return to them of the said sum of $2,000 cash paid on account of said contract of sale, and of the note and mortgage and the real property above described, and all personal property thereon as aforesaid, all of which defendants then and there refused to do and still refuse to do, well knowing in good conscience and equity they ought to do so. That, in order to further defraud and injure these plaintiffs, the said defendants and W. P. Sinnott will, unless restrained by the order of this court, assign and transfer the plaintiffs' said promissory note and mortgage of $2,500, and said defendants will sell and convey the said real property situated in Yamhill County, Oregon, as aforesaid, together with the personal property situated thereon, and put same and every part thereof out of the said defendants' possession and control. That plaintiffs hereby tender and renew their offer to redeliver all said apartment house property unto said defendants. That there has been no income or profit to these plaintiffs from same.''

The defendants Mitchell filed an answer denying most of the allegations of the complaint, and setting up the *bona fides* of said exchange of property on their part.

The plaintiffs filed a reply, denying most of the affirmative matter of the answer and setting up new matter.

The defendants contend that the complaint does not state facts sufficient to constitute a cause of suit. The record fails to show that any demurrer was filed to the complaint.

1. When a complaint is not demurred to, and the defendant answers, and no objection is made to the complaint until the trial or upon the appeal, it is liberally construed, and is entitled to all the intendments in its favor that arise after verdict: *Baker City* v. *Murphy,* 30 Or. 418 (42 Pac. 133, 35 L. R. A. 88); *Fowler* v. *Phoenix Co.,* 35 Or. 562 (57 Pac. 421); *Currey* v. *Butcher,* 37 Or. 386 (61 Pac. 631); *Oregon & C. R. Co.* v. *Jackson County,* 38 Or. 597 (64 Pac. 307, 65 Pac. 369); *Patterson* v. *Patterson,* 40 Or. 562 (67 Pac. 664).

In the absence of preliminary objections to a complaint or other pleading, every reasonable inference will be invoked to support it, after the trial has commenced; the rule being the same whether the objection is made to the evidence as it is produced or by motion after the trial is over: *McCall* v. *Porter,* 42 Or. 61 (70 Pac. 820, 71 Pac. 976). We hold that the complaint states facts sufficient to constitute a cause of suit.

2. This case will have to be determined upon the evidence as to the fraud alleged by the complaint.

Mrs. Lillian Harris, a witness for the plaintiffs, testifies that she went with Mrs. Davis to the office of Mr. Brashner on May 27, 1912, and that Mrs. Davis told him that she had come in answer to a letter and an advertisement written by Brashner, and he said that they (the Mitchells) wanted $16,000 for the place and that they were taking in about $900 a month. Mr. Mitchell testifies (Ev., p. 262) that on that day he was at Mr. Brashner's office, and that he left with him or

in his office one of the Peninsula Apartment cards. This evidence of Mr. Mitchell tends to connect him with Mr. Brashner and with Brashner's efforts for the sale of said apartments to the Davises. This call by Mr. Mitchell at Brashner's office was made just before Mrs. Davis and Mrs. Harris were there. It was on the same day. Mrs. Harris says that, when Mrs. Davis and she called on Mr. Brashner at his office, he went to a desk drawer and got a card and gave it to Mrs. Davis and informed her that it was Mrs. Mitchell's business card, and that Mrs. Davis and she, on that afternoon of May 27th, went to the Peninsula Apartments, and there met Mr. Mitchell. Mr. Mitchell asked Mrs. Davis who sent her there, and Mrs. Davis said, "Mr. Brashner, your agent." Mr. Mitchell then invited them to go in and talk with Mrs. Mitchell. They went in where Mrs. Mitchell was and talked with her. Mrs. Mitchell informed Mrs. Davis that she wanted $16,000 for the house, and told her that it cost her that amount; she said that she had 44 apartments, and that 34 of them were completely furnished for housekeeping. Mrs. Mitchell told Mrs. Davis that she would not think of selling except for the fact that Mr. Mitchell was compelled to go to the mines, and that she wanted to send her daughter to Europe, and that she had all the money she wanted. Mrs. Mitchell said to Mrs. Davis that she had four vacancies in the apartments from the 1st of September to the 1st of February, and that she had a waiting list all the time. Mrs. Harris understood her to say that no one moved out of the apartments. Mrs. Harris says that they viewed four or five of the apartments. Mrs. Mitchell said that the apartments rented for $16.50 to $18 to $35, summer rates. She said she was paying Mr. Sinnott for rent from $350 to $500 a month, and she

advised Mrs. Davis to get a "flat" rate for rent from Mr. Sinnott, and told her that if she could get a rate of $350 per month she would have "a snap." She said that the expense of running the apartments was $100 per month. She showed Mrs. Davis a book concerning the business, and Mrs. Davis copied from this book some figures, upon an envelope that she took out of her pocket-book. This witness says that Mrs. Mitchell told Mrs. Davis that she took in from the apartment house business, from January 1, 1911, to May 1, 1912, over $14,000, and that Mrs. Davis made a memorandum in relation thereto on an envelope. Mrs. Mitchell told Mrs. Davis that she did not want to disturb some of the apartments and that Mrs. Davis had seen four or five of them, and that the others were furnished accordingly.

Mrs. Edythe R. Davis, one of the plaintiffs, testifies that the farm that they exchanged contained 100 acres; that it is five miles from Dayton; 75 acres are in cultivation; 8 acres in commercial orchard, with good house and good stock. She testified also that the farm and the personal property that went with it and the improvements were reasonably worth $16,000. Mrs. Davis testified to reading the advertisement in the "Journal," concerning the apartment house, and to calling upon Mr. Brashner, and to the statements made by him. She called with Mrs. Harris, and Brashner gave her Mrs. Mitchell's business card for the apartment house, and she and Mrs. Harris called on the defendants at the apartment house, and she informed Mitchell that she had come from Mr. Brashner's office. She and Mrs. Harris went in, and she, and Mrs. Mitchell talked about the proposed exchange. She says that Mrs. Mitchell told her that the value of

the apartment house was $16,000, and that their net income at that time was $350 per month. Mrs. Mitchell told her that she had plenty of money; that she paid Mr. Sinnott one half of the gross income of the business as rent for the house; that she was paying him as rent from $350 to $500 per month; that she would use her influence to prevail on Mr. Sinnott to let the Davises have the house at a "flat" rate of $300 or $350 per month; that the least that she had ever taken in during any month was $750 for August, 1911; that from September 1st to February not a person moved from her apartments; Mrs. Mitchell showed witness a book supposed to contain accounts of the business; that Exhibit 2 is the same book, but that 70 pages of said book had been removed since that time; that in this book, when it was shown witness by Mrs. Mitchell, she had in it what she claimed was a statement of the total income of the business for each month, commencing with January, 1911, and ending with May, 1912; that the amount was stated for each month, and the total, for the period, beginning with January 1, 1911, to the end of May, 1912, as stated in said book, was $14,580; that the witness at that time copied from said book the totals for said period and said aggregate of $14,580; said totals were written on an envelope that the witness then had, and it is Exhibit 1; Mrs. Mitchell said that she paid Sinnott, during said 16 months, over $7,000, and that she paid him $350 to $500 a month as rent; Mrs. Mitchell told the witness that the average net income was $350 per month; that she had a large waiting list; that $750 was the least that she ever took in in a month; Mrs. Mitchell showed witness three or four apartments and said the others were furnished equally well; she said that the apartments rented for $16.50 to $35 per

month, and that she rented nothing for less than $16.50 per month; she could not show the other apartments without disturbing the tenants; that the witness believed the statements made by Mrs. Mitchell to be true; that Mrs. Mitchell said her income for May was $840.

The evidence shows without dispute that the plaintiffs conveyed the 100-acre farm and the personal property on it and described in Exhibit 3 of the complaint to the defendants E. D. Mitchell and May C. Mitchell, and that the defendants Mitchell conveyed, by a bill of sale, dated July 1, 1912, to the plaintiff J. Monroe Davis all the furniture and furnishings in said apartment house; said bill of sale being in evidence and marked Plaintiffs' Exhibit 7, and the personal property conveyed thereby being described in said bill of sale. The said farm was conveyed, subject to a mortgage thereon for $4,500, and some interest. In consideration of said mortgages being on said farm, the plaintiffs paid to the defendants Mitchell in cash $2,000, and executed to May C. Mitchell and W. P. Sinnott their promissory note for $2,500 and a chattel mortgage upon some of the personal property conveyed to them as stated *supra* by the defendants Mitchell to secure the payment of said note. Said cash payment, with said chattel mortgage, was made to compensate the Mitchells for the mortgage on said farm, amounting to $4,500, that they agreed to pay.

Part of the furniture sold to the plaintiffs, by the Mitchells, had belonged to Mr. Sinnott. The Mitchells purchased his interest therein and conveyed it to J. Monroe Davis, one of the plaintiffs. The evidence shows that the Mitchells owed Mr. Sinnott for his interest in the furniture $1,000, and the said mortgage was made to him and Mrs. Mitchell jointly, because of

said indebtedness.    He appears to have an interest in said note and chattel mortgage, amounting to $1,000 and interest from July 1, 1912.

On July 3d, after the exchange had been effected, Mrs. Mitchell gave Mrs. Davis two books.    She told Mrs. Davis that one of these books showed the rentals of the house, and Mrs. Davis says that she learned for the first time, from this book, that apartment No. 10 was rented for $10 a month.    Mrs. Mitchell had told the witness that no apartments were rented for less than $16.50, and Mrs. Davis learned from this book that 15 apartments were rented for less than $16.50 per month.    Mrs. Davis says that Mrs. Mitchell had told her that there were only 4 apartments vacant, and that she found that the correct number vacant was 16; that 70 pages had been torn out of this book from the fore part thereof; that in this book Mrs. Mitchell had written the names of all the tenants in the apartments on July 1st and the amount that each was to pay, and that these all footed up for a month only $372.50; that, if every apartment was full and rented at the rates charged in this book, the total income would be only $769; that, when the witness took charge, 16 apartments were vacant, although Mrs. Mitchell said only 4 were vacant; and that the average income per month as represented by Mrs. Mitchell was $911.28.    Mrs. Davis says that the apartments that Mrs. Mitchell failed to show her were not furnished as well as the three or four that she exhibited to her.    The evidence shows that the Davises failed to make anything in conducting the apartment house up to the time that they commenced this suit.

It was shown that on September 28, 1912, R. E. Sewell, as attorney for the plaintiffs, called on Mrs. Mitchell and offered, in behalf of the plaintiffs, to

rescind said exchange and every part thereof and to convey to the defendants Mitchell all of the property that they had conveyed to the Davises, and demanded of the Mitchells that they reconvey to the Davises said farm and the personal property conveyed by them to the Mitchells, and that the Mitchells repay to the Davises said $2,000 that they had paid them, and return to them the $108.75 note mentioned in the complaint, and that the whole matter of said exchange be rescinded, etc., and stated to Mrs. Mitchell, at that time, that he demanded a rescission of said exchange of property, for the reason that the Mitchells were guilty of fraud in inducing the Davises to make said exchange. Mrs. Mitchell refused absolutely to rescind, and told Mr. Sewell that she would fight such a proposition as long as she lived. The evidence of Sewell is not disputed, we believe.

Mrs. Callie Cutler testified that Mrs. Mitchell told her that the furniture and furnishings in the apartment house cost less than $3,600; that Mrs. Mitchell told her that she had fixed up her books so as to make it appear that the apartment house was paying well; that she had some "farmers on the string"; that they were regular "greenies." Mrs. Mitchell told the witness all that she was getting from the Davises. She told her of the $2,500 mortgage on the furniture, and said that she had the farm then, and that she would have the apartment house back by the first of the year for the $2,500 chattel mortgage, and she would sell the apartment house again for $5,000, and that would be making $2,500 "pretty slick."

E. G. Wiley testified that Mrs. Mitchell told him, after the exchange, that the Davises would fail; that they could not pay the rent when due; that she thought they would have the house back and the ranch too; she

said the furniture cost them about $4,000, and that was about all they had in it. The witness says that Mr. Mitchell told him, before the exchange, that he was trying to get the apartment house filled up so as to make a good showing, and that, under existing conditions, the place was doing only about expenses.

A. W. Fish testified that he had a conversation with Mrs. Mitchell about the sale, after it was consummated; that she called the Davises "green farmers," and said they were "dead easy," and that they "skinned them alive," and that she made at least $10,000 or $12,000 on the deal, and would own the farm and the house too by the first of the year.

George Bryan, a furniture dealer, testified that he had examined the furniture and furnishings in the apartment house; that the retail price for the furniture and furnishings, all new, would be approximately $5,829.44; that, as it was when he examined it, it was worth $3,497.73, and that its value on July 1, 1912, the date of the exchange, was approximately the same as that last stated.

The plaintiff J. Monroe Davis testified that he relied solely on the representations made by the Mitchells; that they told him that what they had in the house cost them in cash $16,000; that Mitchell told him the apartment house was making net over $350 per month; that Mrs. Mitchell said that only 4 apartments were vacant, and the fact was that 16 were vacant; that she said she took in over $800 in May, and the least taken in by her was $740 in August; Mrs. Mitchell said that the leaves torn off the book contained her private business, and that they were at the bank; that there were about 23 cords of wood in the basement; and that he knew nothing about apartment house business.

Mr. and Mrs. Mitchell were sworn and denied about

all the evidence of a material nature produced against them. Both of the plaintiffs testify to the representations that the Mitchells made to them to induce them to make the exchange, and the defendants deny making these representations, or most of them.

The evidence of the two plaintiffs and of the two defendants is of about equal weight, and if there were no evidence of fraud, except that given by the two plaintiffs, we would be constrained to hold that fraud is not sufficiently proved, because their evidence is denied by the evidence of the two defendants. But the evidence of Mrs. Harris corroborates the evidence of Mrs. Davis as to the representations made by Mrs. Mitchell the first time that Mrs. Davis and Mrs. Mitchell conversed, concerning the exchange of properties.

Mrs. Callie Cutler, Mr. E. G. Wiley and Mr. Fish testified as to conversations that they, respectively, had with Mrs. Mitchell concerning this exchange of properties, and their evidence tends very strongly to prove that Mrs. Mitchell was guilty of fraud. It is true that Mrs. Mitchell denies making the statements to which they testified. They are disinterested witnesses and unimpeached, and we cannot conscientiously disbelieve them.

There is another fact that we cannot ignore. At a conservative valuation, the 100-acre farm, which the plaintiffs conveyed to the defendants, with its improvements, was worth about $12,000, and a large amount of personal property also was conveyed with the farm. The evidence does not show what this personal property was worth; but we think that all the property conveyed to the defendants was worth not less than $13,000. Both plaintiffs say it was worth $16,000, and one of the witnesses says that Mrs.

Mitchell told him that it was worth $16,000 if it was worth a cent, and that she made from $10,000 to $12,000 in the trade.

The evidence shows that the property that the defendants exchanged for the farm and personal property consisted of second-hand furniture and furnishings, and that it was not worth $4,000. Mrs. Cutler testified that Mrs. Mitchell told her that it cost less than $3,600.

Taking a reasonable view of the evidence as to value, we think that the property conveyed by the plaintiffs was worth at least three times as much as the property that they received from the defendants. Counsel for the defendants contends that the goodwill of the apartment house was exchanged, and that it had considerable value. The goodwills of some kinds of business are valuable, but we do not think that the goodwill of this apartment business was of much value. The parties did not think enough of it to mention it in the bill of sale. The bill of sale purports to convey to Davis certain personal property, specifically describing it.

It was contended also that the lease that the defendants had for the apartments was valuable. Mrs. Mitchell advised Mrs. Davis to get a new lease with a "flat" rate, and this was done. The lease that the Mitchells had was not assignable without the consent of the lessor, and he would not consent to its assignment. The plaintiffs did not bargain for the Mitchell lease, and it was not transferred to them.

The evidence shows that the plaintiffs had no knowledge of the apartment house business, and that they believed the representations made by the defendants, and relied upon them, and that these representations were false and known by the defendants to be false.

As the plaintiffs were not acquainted with the apartment house business, they had a right to rely on the representations of the defendants.

The weight of the evidence shows that Mrs. Mitchell showed Mrs. Davis three or four apartments, and then indicated that she did not want to show the others because to do so would disturb the tenants. She represented to Mrs. Davis, however, that the other apartments were as well furnished as those that she had seen.

3. The defendants contend that, if false representations are made, and the means are at hand to ascertain that falsity, the persons complaining of being defrauded are not entitled to relief.

In *Reynell* v. *Sprye*, 1 D. M. G., side page 710, Lord Chief Justice CRANWORTH says:

"But no such question can arise in a case like the present, where one contracting party has intentionally misled the other, by describing his rights as being different from what he knew them really to be. In such a case, it is no answer to the charge of imputed fraud to say that the party alleged to be guilty of it recommended the other to take advice, or even put into his hands the means of discovering the truth. However negligent the party may have been to whom the incorrect statement has been made, yet that is a matter affording no ground of defense to the other. No man can complain that another has too implicitly relied on the truth of what he has himself stated."

Kerr, Fraud and Mistake, page 47, says:

"A man who has made false representations, by which he has induced another to enter into a transaction, cannot turn around on the person whom he has defrauded and say that he ought to have been more prudent and ought not to have concluded the representation to be true in the sense which the language used naturally and fairly imports."

See, also, to the same effect, *Bank of N. A.* v. *Sturdy,* 7 R. I. 114; *Turner* v. *Kuehnle,* 70 N. J. Eq. 69 (62 Atl. 327); *Lowe* v. *Trundle,* 78 Va. 69; *Lovejoy* v. *Isbell,* 73 Conn. 375 (47 Atl. 682); *Buckley* v. *Acme F. Co.,* 113 Ill. App. 214.

When a person, for the purpose of cheating and defrauding another, makes false representations as to material facts, and the person to whom the false representations are so made believes them to be true and is thereby induced to enter into a contract, to his injury, with the person making such false representations, the person who made such false representations cannot defeat a suit to rescind the contract, so entered into, by showing that the person thus defrauded could have ascertained that such representations were false, by the exercise of diligence.

However, we find from the evidence that the plaintiffs in this case were not guilty of want of proper care in not discovering that the representations made by the defendants were false. We find from the evidence that the defendants Mitchell were guilty of fraud, as alleged in the complaint, and that the plaintiffs are entitled to a rescission of said exchange of property.

4. A person seeking the remedy of cancellation must "do equity," and, as a general rule, the parties must be placed *in statu quo;* but this rule is subject to qualifications.

6 Cyc., pages 307, 308, says:

"If, by the act of the fraudulent party, complete restoration is impossible, if he has so entangled himself in the meshes of his own knavish plot that the defrauded party cannot unloose him, the equitable remedy will not be thereby defeated."

There are other exceptions to the rule that need not be referred to in this case.

5. The offer of restoration need not be a technical tender, such as would be required as a condition precedent in an action at law: 6 Cyc. 312.

In this case a proper offer was made before the suit was commenced, and the defendants absolutely refused to rescind.

The plaintiffs are entitled to a decree rescinding and canceling the contract by which the plaintiffs conveyed to the defendants May C. Mitchell and E. D. Mitchell the farm described in the complaint and the personal property that was conveyed by the plaintiffs to the defendants, as stated in the complaint, and decreeing the plaintiffs to be the owners in fee of said farm of 100 acres and the owners of said personal property, and requiring the defendants, within 30 days from the date of said decree, to convey to the plaintiffs, by a good and sufficient deed of conveyance, said farm of 100 acres as described in the complaint, with a provision that, if said deed is not so made, the decree shall stand for and operate as a good and sufficient deed of conveyance of said farm by the defendants Mitchell to the plaintiffs, and rescinding and canceling absolutely the deed of conveyance, made by the plaintiffs J. Monroe Davis and Edythe E. Davis to Mrs. May C. Mitchell and E. D. Mitchell, dated June 26, 1912, and recorded on page 627 of Book 62 of the records of deeds of Yamhill County, State of Oregon, on the 3d day of July, 1912, conveying to said Mitchells the 100 acres of land described in the complaint, and in said deed, and being the deed of conveyance referred to in the complaint, and requiring the defendants Mitchell to make and deliver to the plaintiff J. Monroe Davis, within 30 days from the date of said decree, a good and sufficient bill of sale, conveying to him all of the personal property that he conveyed to them by the bill

of sale, by him made to them, on and dated July 5, 1912, and being marked Plaintiffs' Exhibit 9, and canceling the last-named document, and requiring said deed of conveyance and said bill of sale, made by the plaintiffs, to the Mitchells as aforesaid, to be delivered by said defendants to the plaintiffs within 30 days from the date of said decree, and also canceling the promissory note for $108.75 referred to in the complaint, and made by the plaintiffs to the defendants, and for the delivery up of said promissory note to the plaintiffs, within 30 days, and for the surrender and delivery of said farm and said personal property by the defendants Mitchell to the plaintiffs at once; and said decree shall also cancel and rescind the bill of sale made by the defendants, May C. Mitchell and E. D. Mitchell, to the defendant J. Monroe Davis, dated July 1, 1912, conveying to said J. Monroe Davis the furniture and furnishings in the apartment house at No. 1135½ Albina Avenue, Portland, Oregon, said bill of sale being Plaintiffs' Exhibit 7, and requiring the plaintiff J. Monroe Davis to make and deliver to said defendants Mitchell a bill of sale conveying to said defendants Mitchell said personal property, subject to the chattel mortgage made by the plaintiffs to May C. Mitchell and W. P. Sinnott on the 1st day of July, 1912, to secure the payment to May C. Mitchell and W. P. Sinnott of the sum of $2,500, and subject also to any proceedings that may have been had or taken to foreclose said mortgage, and decreeing also that the defendant W. P. Sinnott has a valid claim in and to said mortgage and the promissory note, a copy of which is set out in said mortgage, for the sum of only $1,000 and interest thereon at the rate of 6 per cent per annum from July 1, 1912 (if it has not been paid or collected), and decreeing that the said chattel mort-

gage and the promissory note therein described and referred to are null and void and canceled, except as to said interest of said defendant W. P. Sinnott therein for said sum of $1,000 and interest, and decreeing that said mortgage and note are canceled, except as to said interest of said W. P. Sinnott therein, and that, as soon as said $1,000 and interest are paid, said promissory note shall be delivered to the plaintiffs, and requiring said W. P. Sinnott to make said $1,000 and interest out of the property described in said chattel mortgage, if possible, before suing the plaintiffs for any part thereof, or, if said W. P. Sinnott has already realized said $1,000 and interest from the plaintiffs or from the property described in said mortgage (as to which fact this court is not informed), in that event that said promissory note described in said mortgage be delivered to the plaintiffs within 30 days from the date of said decree; and the plaintiffs are entitled to a decree also for the recovery from the defendants of the sum of $2,000 paid by the plaintiffs to the defendants on July 1, 1912, in making said exchange, with interest on said sum at the rate of 6 per cent per annum from July 1, 1912, less $100 as the value of the wood that was on hand in the basement of the building at the time of the exchange, and consumed by the plaintiffs; and the defendants will be entitled also to have indorsed upon said decree the amount of taxes that they may have paid on the farm above referred to, and any money that they may have paid on said $4,500 mortgage on said farm. The court is without information as to the crops raised or harvested on the said farm since July 1, 1912. The plaintiffs are entitled to have the defendants Mitchell account to them for the value of all crops raised or harvested on said premises since July 1, 1912, includ-

ing the crop of 1914, less the reasonable cost thereof. This court cannot make any decree as to the value thereof, because there is no evidence before the court in relation to the same. If the parties cannot agree as to said crops, the matter may be adjusted in another suit or action in relation thereto.

The decree of the court below is reversed, and a decree of this court will be entered in accordance with the terms of this opinion.

REVERSED. REHEARING DENIED.

MR. CHIEF JUSTICE McBRIDE and MR. JUSTICE EAKIN concur.

MR. JUSTICE MOORE took no part in this decision.